# Exhibit A

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
|---|---|
| SUBJ: CONTAINER SHIP (C/S) COSCO BUSAN | CCN: 0250-07GPA 0193 2X (GJ) |

Details:



32. On 12 December 2007 at approximately 1500 hours, S/A's CROSS and ADAIR, LCDR TRIBOLET and Mr. JOYCE interviewed Zong Bin LI, DOB: 08 24 1978, Able Seaman (A/B) (Helmsman), COSCO BUSAN. The interview took place at the United States Attorneys' Office, 450 Golden Gate, San Francisco, CA. Mr. Jonathan HOWDEN attorney for LI was also present during the interview. Department of Justice contract interpreter Amy LO provided translation services. Prior to the interview, BAO in consultation with his attorney HOWDEN, read and signed a limited immunity from prosecution proffer agreement provided by AUSA GEIS. LI provided the following information:

   a. He has been sailing as an Able Seaman for approximately six years. He joined the COSCO BUSAN on or about the 22 October 2007. He is currently employed by Fleet Management.

| FOR OFFICIAL USE ONLY<br>PUBLIC AVAILABILITY TO BE<br>DETERMINED UNDER 5 USC 552 AND 552(a) | CLASSIFICATION STAMP<br>FOR OFFICIAL USE ONLY | PAGE 11 OF 15 PAGES |
|---|---|---|

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
|---|---|

SUBJ: CONTAINER SHIP (C/S) COSCO BUSAN          CCN: 0250-07GPA 0193 2X (GJ)

Details:

b. His duties while the vessel is underway are on the bridge for the 0400-0800 hours in the morning and 1600-2000 in the evening. His tasks while on the bridge are varying depending on the situation. When entering or leaving port he is the helmsman. His duties while in-port are gangway watch and deck maintenance.

c. He has some knowledge of radar operation, but this is not his responsibility. He did not recall anyone complaining about the operation of the radar during any of the transit from PUSAN, KOREA or in Long Beach. He did recall someone coming onboard the vessel in Long Beach to work on something but is unsure what it was.

d. When he is on duty as the helmsman he follows the commands given by either the Master or the pilot.

e. During the transit into and out of Long Beach he believes that there was a pilot onboard. He could not recall if he was on the helm during that transit.

f. He believes he may have been on the helm for some of the transit into San Francisco Bay, but does not remember being on the helm when the vessel went under the Golden Gate Bridge. He was positive that there was a pilot onboard during the in-bound transit to San Francisco Bay.

g. He did not recall any problems with the steering of the vessel. He described the steering as normal and responsive compared to other vessels he has worked on.

h. He was on watch on the gangway at 0400 on 07 November 2007. He was at the gangway for approximately one hour before the pilot boarded the vessel. He met the pilot at the gangway and took him to the bridge. He stayed with the pilot on the bridge and began readying the ship for departure. He believes that the Captain and duty officer were also on the bridge when he and the pilot arrived there. He recalled that the pilot looked at the pilot card and spoke briefly with the Captain or duty officer, but is unsure what the conservation was about. He opined that this conservation was just greetings and nothing more. They did not depart immediately since there were two superintendents onboard. Once the two superintendents had departed the vessel they began to get underway.

i. He felt that the fog was very thick that morning. He could not see the bow of the vessel clearly. He did not recall the pilot conversing with anyone on the bridge about the foggy conditions. In his opinion it was rare for a vessel to get underway in such foggy conditions.

j. When the vessel was departing the berth he was on the helm, the Captain, 3rd Mate and pilot were on the bridge. There was a lookout posted on the bow. The lookout communicated with the Captain or 3rd Mate via a walkie-talkie. The pilot was giving directions to the Captain regarding casting off the lines and the Captain would then give the commands to the A/B's and

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
|---|---|

SUBJ: CONTAINER SHIP (C/S) COSCO BUSAN    CCN: 0250-07GPA 0193 2X (GJ)

**Details:**

Ordinary Seaman (O/S's). He recalled that the 3rd Mate did express concerns to him about the foggy conditions just as they were getting underway.

k. After departing the berth the pilot was standing and walking around on the bridge. He may have also went out on to the bridge wing. He recalled the 3rd Mate and pilot both looked at the radar. He could not recall if the pilot spent more time looking at the radar or out of the window.

l. The pilot gave rudder commands directly to him and he would then repeat the command to ensure he had heard it clearly and then execute the command. He did not feel that there were any problems with him understanding the pilots' commands. He recalled one command as port 10 degrees; he said that it seemed the pilot kept that command on a long time in his opinion.

m. At this point during the interview LCDR TRIBOLET played selected sections of the voyage data recording .wav files on a laptop computer. LI was able to distinguish his voice and the voice of the pilot from the audio of the .wav files. He recalled the day of the allision more clearly after hearing the audio from these .wav files.

n. He advised that when the allision occurred he felt a vibration and then the pilot immediately gave a hard starboard rudder command. He believes that the pilot and Captain were both looking at the radar to his left just before the allision. He felt that the pilot gave the hard starboard command just after the BOSN reported via the walkie-talkie that he could see the bridge pier. Again LCDR TRIBOLET played a selected section of .wav files, it was apparent that the pilot gave the hard starboard command simultaneously as the BOSN reported that he could see the bridge pier.

o. The pilot then directed the vessel to anchor. While the vessel was en-route to the anchorage the pilot was talking on his cellular telephone, he believes that the pilot called the Coast Guard and is not sure who else he called, but that he was on the telephone a lot.

p. Once they were anchored the pilot went into the bathroom in the back of the bridge two or three times in approximately a fifteen minute time span. The pilot stayed in the bathroom for approximately two to three minutes each time he went into the bathroom. From his position on the bridge he was unable to hear the toilet flush when the pilot was in the bathroom. Then some people came onboard from shore. Another pilot came onboard with these people and said he was taking over from pilot COTA. He said that pilot COTA and the other people were to the right side of the bridge talking and laughing. They were speaking softly some of the time and at other times a bit louder. He was unable to understand what they were saying. Not long after this pilot COTA left the vessel with some of the other people.

q. He did not recall anyone saying anything about problems with the radar at anytime during the transit before or after the allision.

r. LI provided no further pertinent information and the interview was concluded.

| FOR OFFICIAL USE ONLY PUBLIC AVAILABILITY TO BE DETERMINED UNDER 5 USC 552 AND 552(a) | CLASSIFICATION STAMP FOR OFFICIAL USE ONLY | PAGE 13 OF 15 PAGES |
|---|---|---|

  

## U.S. COAST GUARD SUMMARY OF STATEMENT FORM

(Please Print Clearly)

Witness Name: **LI ZONG-BIN**  Employer Name:
Street Address:                  Employer Address:
City/State/Zip:                  City/State/Zip:
Phone No:                        Phone No:
Position: **AB (HELMSMAN)**       License/Doc. #

**11/7/07**
AT TIME OF INCIDENT
- Following the pilot's order
- can not see forward
- very foggy
- Pilot said "hard starboard", when very close to bridge

**11/8/07**

- Receives orders from Pilot - Repeats order - then carries out order
- All orders properly executed - No corrections or objections happened during outbound transit
- Reports back to Pilot what rudder angle indicator is reporting.
- Also uses gyro compass for course

(OPTIONAL): I, the undersigned, have read the above summary of my statement and verify that it is complete and accurate:

SIGNATURE OF WITNESS        DATE OF INTERVIEW: 11/7/07 & 11/8/07

The above (and, if applicable, continuation page(s)) is an accurate and true summary of my interview with the above named witness.

SIGNATURE OF INVESTIGATOR   DATE OF INTERVIEW: 11/7/07 & 11/8/07

Page 1 of ___

"EVIDENCE: _____ #012-07"

## INTERVIEW SUMMARY WITH A/B (HELMSMAN) OF COSCO BUSAN, LI ZONG BIN

Approximately 1230 on 07 November 2007, on board M/V COSCO BUSAN, met with A/B on the bridge of the vessel. Language barrier was a very large factor and I had an extremely hard time in understanding Mr. Bin. The following is a summary of that interview:

A/B states that he is the helmsman and follows all of the Pilot's orders. Visibility is very bad and it is very foggy, can not see very far forward. A/B said Pilot ordered hard starboard when they were very close to bridge.

Due to language barrier the interview was terminated.

On 08 November 2007 conducted a second interview with Chinese interpreters LTJG Bohr and Auxiliarist Chang.

A/B states that when he receives an order from the pilot that he repeats the order before executing the order then carries out the order. All orders were properly executed and at no time did the Pilot have to repeat or correct any orders given. A/B also states that he reports to the Pilot what the rudder angle indicator and gyro compass is reporting.

This statement is true and accurate to the best of my knowledge and abilities.

CYNTHIA L. REAVIS, CWO, USCG

*EVIDENCE: ~~3095030~~ ~~B30~~ ~~DF~~ JN

FCN 3095030 #003 CLR