Jonathan R. Howden (CA State Bar No. 97022)
Lynn R. Fiorentino (CA State Bar No. 226691)
THELEN REID BROWN RAYSMAN & STEINER LLP
101 Second Street, Suite 1800
San Francisco, CA  94105
jhowden@thelen.com
Tel. 415.369.7157
Fax 415.369.8683

Attorneys for Material Witnesses
LIANG XIAN ZHENG,
KONG XIANG HU,
ZONG BIN LI AND
SHUN BIAO ZHAO

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re Material Witness Warrant | Case No.: 07 90552 MISC VRW (JCS)<br><br>**AMENDED JOINDER IN MOTION FOR RELEASE AND PROFFER RE DEPOSITION TESTIMONY OF MATERIAL WITNESSES LIANG XIAN ZHENG, KONG XIANG HU, ZONG BIN LI AND SHUN BIAO ZHAO**<br><br>**Date:  September 18, 2008**<br>**Time:  2:00 p.m.**<br>**Courtroom:  A, 15th Floor** |

    Material Witnesses Liang Xian Zheng, Kong Xiang Hu, Zong Bin Li and Shun Biao Zhao,

by and through their counsel, Jonathan Howden, hereby join in the motion of Captain Mao Cai

Sun for his release or, in the alternative, to compel the scheduling of a Rule 15 deposition

forthwith.  In support of this joinder, the Material Witnesses  provide to the Court the government

interview memoranda (attached hereto as Exhibits 1-3), which in part, demonstrate that there is no

practical impediment to immediate Rule 15 depositions.

AMENDED JOINDER IN MOTION FOR RELEASE AND PROFFER RE DEPOSITION TESTIMONY OF
MATERIAL WITNESSES LIANG XIAN ZHENG, KONG XIANG HU, ZONG BIN LI AND SHUN BIAO ZHAO

## SUMMARY OF TESTIMONY

### LIANG XIAN ZHENG

1. Zheng was the Bosun on the Cosco Busan. As reflected in the government's interview memoranda, he was interviewed by the government twice, once on December 6, 2007 and again on May 14, 2008 (Exhibits 1A and 1B). Each interview memorandum is less than two pages long. In his second interview, Zheng confirmed that the first interview memorandum was essentially accurate.

2. Zheng's duty as Bosun is to assist the Chief Officer with the cargo and to see to all matters relating to the decks. He is not an officer and has no navigation responsibilities.

3. As reflected in his interview memoranda, Zheng was the acting forward lookout on the morning of November 7, 2007. He was stationed in the bow and communicated with the bridge via handheld radio. At some point after the vessel was underway, Zheng saw the bridge pier through the fog directly in front of the vessel. He called out a warning to the Captain (which can be heard on the VDR recording) and went to standby at the starboard windlass. He remained there until after the allision when he was ordered to assist with ballast soundings and examination of the damage.

### KONG XIANG HU

4. Hu was the Chief Officer on the Cosco Busan. He was the second highest ranking officer on the vessel and he supervised the other officers and deck crew. However, as Chief, his principal duties included navigation at sea, loading and unloading the vessel and overseeing all cargo handling.

5. Hu was interviewed twice. The first was on November 20, 2007 (Exhibit 2A). The second occurred over two days, May 22 and 23, 2008 (Exhibit 2B).

6. In his first interview, Hu related that he spent the entire night before the accident loading and unloading cargo. In the morning, when the vessel left the dock, he was stationed in the bow (the forward station), accompanying the Bosun, who was the lookout. Hu acted as the lookout for a few minutes when the Bosun and two Able Bodied Seamen went to lower the pilot's ladder and communicated via the handheld radio with the Captain during that interval. When they

1    returned, Hu left the forward station to eat.  While he was eating, the vessel allided with the

2    bridge.  Hu thereafter acted to shift the remaining fuel oil in its bunkers to prevent any more oil

3    from leaking into the bay.[1]

4         7.  On the day of the accident, Hu had no navigational responsibilities, was not on the

5    bridge, had no contact with the pilot and was not a witness to the allision.

6         8.  As reflected in his second interview, during the days following the allision, a Fleet

7    representative asked him to write an English language statement detailing his activity leading up

8    to the allision.  The Fleet representative told him to "tell the truth".  Hu wrote a statement and

9    turned it over to Fleet, but failed to note that he was eating breakfast at the time of the accident for

10   fear of being criticized by his superiors.

11        9.  Hu also was asked to sign a "Statement of Facts" memorandum along with other

12   officers from the ship.  He signed it only after he pointed out and corrected an error in the

13   narrative which attributed the verbal warning about the proximity of the bridge tower to him rather

14   than to the Bosun.

15        10.  Also during his second interview, Hu related hearsay statements from both the Second

16   and Third Officers relating to after-the-fact passage plans that the Second Officer had been

17   directed to create by one of the Fleet representatives.  He recalled that he was asked to sign one of

18   these plans, after the fact, and that its format was different from the original passage plan.  He

19   signed the plan.

20        11.  When asked about the paper navigational chart reflecting the planned route of the

21   vessel out of San Francisco Bay, Hu stated that he looked at the chart briefly, later in the morning

22   after the accident.  He was wondering if the allision occurred because the vessel was following the

23   wrong course out of the Bay.  When shown a photograph of the chart taken at a later date, he

24   observed that notations of time may have been added to the chart after the fact.

---

[1]    Hu has repeatedly tried to explain, with limited success, that he was not assigned as a second "lookout" on the morning of November 7, 2007.  Rather, the bow was his "duty station" as ordered by the bridge officers.  Both are terms of art and denote related, but different duties.  Hu and the other officers all are qualified to act as "lookouts", but on that morning that was not Hu's designated assignment or duty.  Rather, he was manning the forward station, just as the Second Officer was manning the stern station.  He may have acted as a de facto lookout by virtue of his duty station, but that was not his designated assignment.

SHUN BIAO ZHAO

12. Shun Biao Zhao was the Second Officer on the Cosco Busan. He has been a professional mariner since 2003. This was his first voyage as a Second Mate. He was interviewed on four occasions by federal authorities. He was interviewed on December 13, 2007 (Exhibit 3A), May 14, 2008, June 11, 2008 and June 27, 2008 (all of which are included in reverse chronological order in Exhibit 3B).

13. In his December 13, 2007 interview, Zhao explained that as Second Officer, his primary responsibilities included the creation of passage plans and the maintenance of key navigation equipment on the bridge.

14. For the transit from Oakland to Pusan, Zhao created a "port to port" passage plan, checked it against the route already marked on the paper chart, and left the paper chart on the chart table on the bridge. His watch ended at 6:00 A.M. on the morning of November 7, 2007, and when it was over he left the bridge. He never met or spoke to the pilot. At the time the vessel left the dock in Oakland, Zhao was stationed in the stern, standing by. He remained there until after the allision and he was not a percipient witness to any material fact prior to that.

15. During that interview, he also stated that he plotted way points 1-5 on the chart while the vessel was at anchor after the allision. However, he denied erasing or removing any other marks on the chart, other than as necessary to plot the first five way points.

16. In his May 14, 2008 interview, Zhao identified a passage plan as the one that he prepared prior to the vessel's departure from Oakland on November 7, 2007.

17. During the week of May 19, 2008, Zhao, Hu and Zheng were deposed by civil plaintiffs in the related civil class action law suits against Fleet Management, Regal Stone, John Cota and others. During the course of those depositions, counsel for Mr. Cota produced a number of documents and asked a great number of probing questions relating to them that had not been explored with the witnesses previously. Each of the witnesses exercised their Fifth Amendment right and declined to answer questions. However, the questions clearly presaged cross-examination in the anticipated Rule 15 depositions and prompted further inquiry of the witnesses.

/ / /

AMENDED JOINDER IN MOTION FOR RELEASE AND PROFFER RE DEPOSITION TESTIMONY OF MATERIAL WITNESSES LIANG XIAN ZHENG, KONG XIANG HU, ZONG BIN LI AND SHUN BIAO ZHAO

18. As part of that further inquiry, the government learned that Zhao's statements to the investigators on December 13, 2007 and May 14, 2008 were not complete or entirely correct. In fact, as stated in his subsequent interviews, he had prepared a "Waypoint for Windows" format, "pilot to pilot" passage plan before departing Oakland on November 7, 2007, rather than the "Fleet format", "berth to berth" passage plan that he identified on May 14, 2008. Because he had only created a "pilot to pilot" passage plan on November 7, 2007, he could not and did not check the way points for the pilotage waters within San Francisco Bay against those on the paper chart before the vessel left Oakland, contrary to what he told the investigators on December 13, 2007.

19. As reflected in his interviews on June 11 and 27, 2008, he had prepared "Waypoint for Windows" format, pilot to pilot passenger plans for both the Long Beach to Oakland transit as well as the Oakland to Pusan voyage. It was that version of the passage plan that he left on the bridge on the morning of November 7, 2007, believing that he was not required to do more and that the pilot would only use the paper chart and the passage plan as a reference if he desired to look at it.[2]

20. Following the allision, several Fleet superintendents re-boarded the vessel. When Zhao resumed his duties on the morning of November 8, 2007, one of the superintendents told him that the original passage plan should have been berth to berth rather than pilot to pilot, so Zhao created a new "Waypoint for Windows" format, berth to berth passage plan for the Oakland to Pusan voyage on November 7, 2007. Later that day, the same superintendent informed Zhao that the passenger plan should be done in the "Fleet" format as found in the Fleet manual.[3] However, there was no electronic template for the Fleet passage plan, and so Zhao grudgingly began work on a new one from scratch.

21. At some point near that time, Zhao found electronic copies of a Fleet passage plan from an earlier voyage of a Fleet managed vessel on the computer and continued to create the Fleet format passage plan using it as a template. He completed his new passage plan sometime

---

[2]  In fact, in keeping with long-standing maritime practice, defendant Cota himself admitted that he never consulted the paper chart or the written passage plan.

[3]  The Fleet form requires the inclusion of considerable additional data in it.

AMENDED JOINDER IN MOTION FOR RELEASE AND PROFFER RE DEPOSITION TESTIMONY OF
MATERIAL WITNESSES LIANG XIAN ZHENG, KONG XIANG HU, ZONG BIN LI AND SHUN BIAO ZHAO

1  around the afternoon of November 9, 2007.  The Fleet format calls for several signatures,

2  including the Captain, the Chief Officer and the Second and Third Officer.  He asked both the

3  Captain and the Chief to sign it which they did.  At about this time, Coast Guard personnel who

4  were aboard the vessel requested the production of the passage plan.  A Fleet superintendent

5  directed Zhao to give him the Fleet version, and since the Third Officer had not yet signed it,

6  Zhao signed his own name and forged the Third Officer's signature.

7      22.  The Coast Guard representative noticed a reference in the passage plan to "Brisbane"

8  and the "Australia Coast" and called Zhao's attention to the error.  Zhao took the passage plan and

9  reworked the page, eliminating the references.  However, the changes were made on the signature

10  page, and because the Coast Guard was waiting for the passage plan, Zhao forged everyone's

11  signature on the page and gave the passage plan to the Coast Guard.

12      23.  In general terms, Zhao also stated that they were provided with extensive Fleet

13  Management forms and manuals and instructed to learn them.  However, given their work load

14  they did not.  Accordingly, Zhao does not believe that any passage plan appraisal forms were filled

15  out before the allision on November 7, 2007.  Other forms may not have been filled out in a timely

16  manner either.

17                                    **DISCUSSION**

18      ZHENG'S TESTIMONY

19      24.  Zheng is not an officer.  He has no navigational responsibilities.  He was not on the

20  bridge on the day of the accident.  He never saw or spoke to the pilot.  His entire involvement with

21  this matter is that he called out a last moment warning that the Cosco Busan was about to hit a pier

22  of the Bay Bridge on the morning of November 7, 2007.  Yet on that basis, he has been held in

23  this country for 10 months against his will.  There is no legitimate reason that his deposition has

24  not been taken already or scheduled for the immediate future.  Given the simple and

25  straightforward nature of his evidence, even waiting another month is of questionable

26  constitutional merit.  It cannot be considered "reasonable" within the meaning of 18 U.S.C. §3144

27  to continue to detain him for such an extraordinary period of time given the minimal evidentiary

28  value of his testimony.

HU'S TESTIMONY

25. Hu was unloading and loading cargo all night before the Cosco Busan left Oakland on November 7, 2007. He was not on the bridge, and had no navigational responsibilities that night or the following morning. He never met or spoke to the pilot that day. He was stationed in the forward area on the morning of November 7, 2007, and for a few minutes assumed the duties of the Bosun and acted as the lookout. He relinquished those duties as soon as the Bosun returned. Hu was eating breakfast when the vessel struck the bridge. He saw nothing before the accident and only the results after the fact. He can offer no facts regarding the cause of the allision.

26. Hu did become aware of, and perhaps involved in, the creation of one passage plan, after the fact, when he was asked to sign a Fleet format passage plan, probably on November 8 or 9, 2007. He also heard and was involved in discussions with the Second and Third mate about the creation of after-the-fact passage plans for November 7, 2007, that occurred on or about November 8 and 9, 2007. Arguably these acts implicate the obstruction counts filed against defendant Fleet Management. However, it is harder to understand how these facts implicate defendant Cota at all. Certainly, they do not implicate the false statement charges against him.

27. Similarly Hu's extremely limited view of the events of November 7, 2007, call into serious question the materiality of his testimony vis-à-vis the alleged negligence and other allision- related charges against both Fleet and Cota, and certainly are not so complex as to prohibit any party from immediately taking his testimony in a Rule 15 deposition. Again, the continued detention of this witness stretches the statutory and constitutional boundaries of Section 3144. To extend his detention beyond 10 months pushes it to the breaking point.

ZHAO'S TESTIMONY

28. Zhao is in a category of witness different from that of his aforementioned crew-mates. He is an officer and it was his duty to prepare a passage plan and the chart for the departure from Oakland on the morning of November 7, 2007. He did prepare the passage plan and set out the pre-marked chart of San Francisco Bay on the map table early on the morning of November 7, 2007. However, the passage plan was a pilot to pilot plan and contained no way points for the pilotage waters inside San Francisco Bay. Nor was it the format prescribed in the Fleet

AMENDED JOINDER IN MOTION FOR RELEASE AND PROFFER RE DEPOSITION TESTIMONY OF
MATERIAL WITNESSES LIANG XIAN ZHENG, KONG XIANG HU, ZONG BIN LI AND SHUN BIAO ZHAO

1   Management manual.  Zhao left the bridge before the pilot arrived and was stationed at the stern as

2   the vessel left Oakland.  He saw nothing relating to the allision.

3          29. Zhao did not tell the truth about the passage plan during his first two interviews, and

4   led the investigators to believe that his passage plan was berth to berth – that it included waypoints

5   inside San Francisco Bay, and that he checked the accuracy of the way points against the paper

6   chart on the chart table.  In fact, he did neither.[4]

7          30.  Zhao also did not disclose at that time that he had been instructed by Fleet

8   representatives, after the fact, to create additional passage plans, including one in the Fleet

9   prescribed format, and eventually gave one such passage plan to the Coast Guard, which also

10  contained forged signatures of all of the officers.  In May of 2008, Zhao was deposed by the civil

11  plaintiffs in the related class action suits and was cross examined by Cota's civil counsel.  Zhao

12  did not provide substantive answers to the questions at the deposition, but subsequent inquiry

13  regarding many of the previously unseen documents and new questions raised during the

14  deposition led to the discovery of Zhao's failings.

15         31.  In his subsequent interviews, he also revealed that other Fleet forms, such as the

16  Passage Plan Appraisals also had not been filled out until after the allision on November 7, 2007.

17  Other documents also may have been dated or created after the fact.

18         RULE 15 DEPOSITIONS

19         32.  Bosun Zheng and Helmsman Li[5] currently are scheduled to be deposed by the parties

20  in the criminal case on October 1 and 3, 2008, respectively.  As previously discussed, they were

21  percipient witnesses to only the most minor aspects of any of the issues presented in this case.

22  There is no principled reason why their depositions should be delayed beyond those October 2008

23  dates.  Further, once their depositions have been completed, they will have fulfilled their

24  obligations as material witnesses and they should be released from any further obligation to appear

25  in this district for trial.  Nothing in Section 3144 countenances the detention of material witnesses

---

[4]  In terms of causation, it is again worth noting that Cota admitted later that he never looked at the passage plan or the paper chart.

[5]  Li's prospective testimony is discussed in detail in his Emergency Application for Travel Order which was filed with the Court on August 21, 2008.

AMENDED JOINDER IN MOTION FOR RELEASE AND PROFFER RE DEPOSITION TESTIMONY OF
MATERIAL WITNESSES LIANG XIAN ZHENG, KONG XIANG HU, ZONG BIN LI AND SHUN BIAO ZHAO

1    for eleven months in order to take Rule 15 depositions as a mere back-up for trial testimony in

2    case a foreign witness does not appear at trial.  It should not be used in such a fashion in this case.

3            33.  Similarly, Chief Hu played a relatively small and straightforward role in the events

4    preceding and following the allision.  His testimony is not complicated.  Nor are the facts to which

5    he can testify.  All parties can examine him effectively based upon the charges and discovery

6    already produced by the government.  That is all that Rule 15 and the Constitution requires and is

7    completely consistent with the competing concerns for the preservation of each parties' rights as

8    reflected in the interplay between Rule 15 and Section 3144.  Hu should be permitted to discharge

9    his responsibilities as a material witness during the month of October, 2008, and thereafter to

10    depart the district.

11            34.  Although his testimony is more complicated than that of his crewmates, Second

12    Officer Zhao is entitled to the same consideration as the other more substantial material witnesses

13    in this matter.  The parties repeatedly contend that they cannot adequately prepare for Rule 15

14    depositions or for trial at any time in the near future.  Yet the material witnesses, even the more

15    substantial ones, should not continue to be held in this district any longer.  The one year

16    anniversary of the allision is rapidly approaching, and the rights of the material witnesses,

17    including Zhao, at some point soon, must take precedence over even the rights of the defendants

18    herein.  Rule 15, in part, is intended to balance those competing interests, but that balance can only

19    be maintained if the witnesses are permitted to provide their testimony within a reasonable period

20    of time.  One year is not a reasonable period of time.

21            35.  Rule 15 depositions always pose some risk of prejudice to both the government and

22    the defendants.  Anytime that a witness is deposed in a criminal case, prior to trial, a defendant

23    will be concerned that not all discovery has been provided, that more preparation for the

24    examination is required, or that new evidence or issues have yet to be developed.  Similarly, the

25    government will be concerned that any conviction is not upset later by a finding that the

26    deposition violated the defendant's due process or confrontation clause rights.  But that risk is

27    integral to the government's strategic decision to detain material witnesses as part of its case in

28    chief in any criminal case.

AMENDED JOINDER IN MOTION FOR RELEASE AND PROFFER RE DEPOSITION TESTIMONY OF
MATERIAL WITNESSES LIANG XIAN ZHENG, KONG XIANG HU, ZONG BIN LI AND SHUN BIAO ZHAO

36.  The government cannot detain the witnesses and then simply rely on the defendants' subsequent pleas for additional time for adequate preparation to absolve the government from the burden they have undertaken in detaining the witnesses in the first instance.  Rather, the government must at all times take responsibility for its decision to detain the witnesses and move forward in an effort to secure their testimony in the manner prescribed by law.  The government has (or should have) an affirmative obligation to protect the rights of the material witnesses by assuring that any charging decisions and concomitant discovery obligations are addressed in a timely manner, just as they have the obligation to protect the defendant's constitutional rights even in the midst of their efforts to convict him.  If the government fails in these responsibilities, it offends the very limited authority that it has to detain the witnesses in the first instance.  To the extent that the government risks prejudice to the constitutional right of the defendants to effectively examine the witnesses, it is one that the government must factor into their complicated calculus of prosecution planning from the outset.  It is not a burden that can be visited upon the material witnesses.

## CONCLUSION

37.  One year is an extraordinary length of time to force these witnesses to remain in the United States pending trial or deposition.  As reflected in Captain Sun's Motion for Release (in which Li, Zheng, Hu and Zhao each join), the lawful basis for continuing to detain these witnesses has been stretched to the point of breaking.  All of the material witnesses should either be deposed forthwith or released outright.

Dated:  September 3, 2008            Respectfully submitted,

                                     THELEN REID BROWN RAYSMAN & STEINER LLP


                              By        /s/ Jonathan Howden
                                     Jonathan Howden, CA Bar No. 97022
                                     Attorney for Material Witnesses Lian Xian Zheng, Kong
                                     Xiang Hu, Zong Bin Li and Shun Biao Zhao

AMENDED JOINDER IN MOTION FOR RELEASE AND PROFFER RE DEPOSITION TESTIMONY OF
MATERIAL WITNESSES LIANG XIAN ZHENG, KONG XIANG HU, ZONG BIN LI AND SHUN BIAO ZHAO