Exhibit  1

ZHENG LIAN XIAN
Bosun

# Exhibit  1A

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
|---|---|

SUBJ: CONTAINER SHIP (C/S) COSCO BUSAN          CCN: 0250-07GPA 0193 2X(GJ)

Details:



27.  On 06 December 2007, S/A CROSS, S/A ADAIR, AUSA GEIS, LCDR TRIBOLET, and Mr. MATHUR interviewed Liang Xian ZHENG, DOB: 05 01 1069, Boatswain (BOSN), COSCO BUSAN. The interview took place at the United States Attorneys' Office, 450 Golden Gate, San Francisco, CA.  Mr. Jonathan HOWDEN attorney for WANG was also present during the interview.  Department of Justice contract interpreter Amy LO provided translation services.  Prior to the interview, ZHENG in consultation with his attorney HOWDEN, read and signed a limited immunity from prosecution proffer agreement provided by AUSA GEIS.  ZHENG provided the following information:

    a.  He received his maritime training at Guangzhou Maritime School in 1992.

    b.  He became a BOSN in 2003, and currently works for Fleet Management.  He boarded the COSCO BUSAN on 24 October 2007.

    c.  On the morning of 07 November 2007 he was checking the lashing of the cargo onboard the COSCO BUSAN.  Then the Captain gave the order to prepare to get underway.  ZHENG went to the bow of the vessel and awaited the orders to release the lines.

    d.  Shortly after departing the berth, he was ordered by the Chief Mate to rig the pilot ladder.  He then returned to the bow and assumed the duties of the bow lookout.

    e.  He believes that he was at the bow lookout position for about 10 minutes and he was able to see the bridge pier through the fog.  He immediately reported this to the ship's Captain via a handheld radio.  The report was made in Chinese.  He then ran back to the starboard anchor windlass and

| FOR OFFICIAL USE ONLY PUBLIC AVAILABILITY TO BE DETERMINED UNDER 5 USC 552 AND 552(a) | CLASSIFICATION STAMP FOR OFFICIAL USE ONLY | PAGE  9  OF  15  PAGES |
|---|---|---|

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
|---|---|

SUBJ: CONTAINER SHIP (C/S) COSCO BUSAN        CCN: 0250-07GPA 0193 2X(GJ)

Details:

stood-by awaiting further commands from the Captain. He advised that he
expected the Captain to give him an order to let go the anchor in order to
attempt stopping the ship before it allided with the pier. He was
surprised that he did not receive a command to let go the anchor. S/A
CROSS asked ZHENG if he was afraid during this time, and he advised that he
was scared.

f.   He said that he felt the impact. AUSA GEIS provided ZHENG with a (not to
scale) drawing of the vessel in relation to the pier. ZHENG described what
he saw and drew on the paper. His drawing depicted the bridge pier
appearing just off the port bow of the COSCO BUSAN when he first saw it
(ENCLOSURE (16)). He also said that the pier was within approximately 100
meters of the vessel when he saw it.

g.   After the allision the ship proceeded very slowly. He was still stationed
at the anchor windlass awaiting further orders.

h.   Once the ship was anchored the Chief Mate ordered him to assist with taking
ballast soundings. He helped check the damaged area to see if oil went
into the ballast.

i.   He saw the damage to the hull of the vessel and also saw the oil leaking
from the damaged area. He described the oil as flowing out not dripping.

j.   He did not recall any discussion with anyone regarding the fog. He has not
discussed the accident with any of the vessel's crew since that day. They
have only discussed when they could go home.

k.   ZHENG provided no further pertinent information and the interview was
concluded.



28.

29.

30.

| FOR OFFICIAL USE ONLY PUBLIC AVAILABILITY TO BE DETERMINED UNDER 5 USC 552 AND 552(a) | CLASSIFICATION STAMP FOR OFFICIAL USE ONLY | PAGE  10  OF  15  PAGES |
|---|---|---|

"驾驶台, 前面有桥墩, 桥墩。"

"Bridge: there is the bridge pier in front
of bridge pier

Captain: "什么讲?"

"what did you say?"

桥墩啊, 桥墩啊"

"Bridge pier! bridge pier!"

Captain: "看到了, 看到了"

"I saw it! I saw it"

Exhibit  1B

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
|---|---|

SUBJ: ~~CONTAINER SHIP (C/S) COSCO BUSAN~~        CCN: 0250-07GPA 0193 2X(GJ)

**Details:**

49.  This Supplemental Report updates the Closed Report dated 28 March 2008.



51.  On 14 May 2008, S/A CROSS, AUSA Jonathan SCHMIDT, USAO San Francisco, CA interviewed ZHENG at 101 2nd Street, San Francisco, CA.  ZHENG was accompanied by his attorney Mr. Jonathan HOWDEN, Amy LO provided translation services.

  a.  ZHENG was the forward lookout on 07 November 2007 during the COSCO BUSANs' departure from Oakland, CA.

  b.  His duties as a lookout are to report anything he thinks he hears or sees to the bridge.  He clarified that by bridge he is referring to the ships Captain.  He and the Captain communicate via handheld radio.

  c.  He was on the bow of the ship with the Chief Officer for a few minutes when they departed the berth, and then went to the port side of the ship to rig the pilot ladder for use later when the pilot disembarks the ship.  He then returned to the bow to assume his duty as the forward lookout and the Chief Officer went to eat.

  d.  He was allowed to review paragraph 27 a-k of pages 9-10 of the CGIS report dated 05 January 2008 and confirmed it accurately reflected his intital interview with CGIS and AUSA.

  e.  S/A CROSS then played the audio portion of the voice data recorder on a laptop computer.  ZHENG confirmed that he heard his voice on the recording denoted as 000613.wav.  He spoke in Mandarin Chinese to the Captain.  LO translated the conservation.  ZHENG told the ships bridge that the bridge was in front.  Translated by LO as; bridge pier in front.  He also said that the Captain confirmed that the received the radio transmission.  ZHENG and LO listen to the audio recording several times and provided AUSA SCHMIDT with a written transcript of his radio transmission.  This transcript was written in both Mandarin Chinese and English **(Enclosure (28))**.

  e.  Approximately ten minutes after returning to the bow from rigging the pilot ladder he saw what he thought was the bridge pier through the fog.  The bridge pier was almost directly in front of the ship.  He estimated that the pier was approximately 50-100 meters away when he saw it.  ZHENG was shown two video clips taken from Yerba Buena Island on the morning of 07 November 2007, he said that the video clip from YBI 3 @ 0815:43 hours and YBI 2 @ 0815:45 hours depict less fog than he remembers from his position on the COSCO BUSAN on 07 November 2007.  He said that the fog was such that he could not see landmarks or the water.

  f.  ZHENG then ran to the starboard windlass.  He said that he felt he could have been killed if the ship hit the pier head-on.  He also thought that he might get an order to drop the anchor.

| FOR OFFICIAL USE ONLY PUBLIC AVAILABILITY TO BE DETERMINED UNDER 5 USC 552 AND 552(a) | CLASSIFICATION STAMP FOR OFFICIAL USE ONLY | PAGE  2  OF  4  PAGES |
|---|---|---|

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
|---|---|

SUBJ: CONTAINER SHIP (C/S) COSCO BUSAN          CCN: 0250-07GPA 0193 2X(GJ)

Details:

    g. ZHENG provided no additional pertinent information and the interview was concluded.

Exhibit 2

**KONG  XIAN  HU**
**Chief  Officer**

# Exhibit  2A

**United States Environmental Protection Agency**
**Criminal Investigation Division**
**Investigative Activity Report**

| | |
|---|---|
| **Case Number** 0900-M107 | |
| **Case Title:** M/V COSCO Busan | **Reporting Office:** San Francisco, CA, Area Office |
| **Subject of Report:** INTERVIEW WITH KONG XIANG HU ON NOVEMBER 20, 2007. | **Activity Date:** November 20, 2007 |
| **Copies to:** | **Related Files:** |
| **Reporting Official and Date:** Scot R. Adair, SAGT 26-NOV-2007 | **Approving Official and Date:** Nicholas J. Torres, SAC [pending] |

## SYNOPSIS

11/20/2007 - On the above referenced date, Kong Xiang Hu was interviewed at the United States Attorney's Office, San Francisco. EPA-CID SA Scot Adair, Coast Guard Investigative Service (CGIS) SA Carl Cross, Assistant United States Attorney Stacey Geis, Department of Justice Trial Attorney David Joyce, and United States Coast Guard Attorney Chris Tribolet were present for the interview. Hu's attorney, John Howden was also present. DOJ contract interpreter Nancy Shum provided translation services.

Prior to the interview, Hu (in consultation with Howden) read and signed a limited immunity from prosecution proffer agreement provided by AUSA Geis.

## DETAILS

Hu provided the following information; he is the Chief Officer on the Motor Vessel COSCO Busan (M/V Busan). His primary responsibilities as Chief Officer include navigation (at sea), deck maintenance, care of the cargo, vessel stability, and cargo loading. He manages as many as eleven crew members, including the Boson, the 2nd Mate, and the 3rd Mate. His management of crew members often depends on where the ship is (at sea or in port) and the activity that is occurring. Hu's direct supervisor is Sun Mao Cai, the ship's Captain. Hu routinely interacts and takes direction from Captain Sun. Hu and the rest of the crew boarded the M/V Busan on October 24 or 25, 2007. The Chief Engineer boarded the vessel sometime before October 24/25, 2007. Hu works two shifts on the M/V Busan; 0400-0800 and 1600-2000. HU has worked on various types of vessels

This document contains neither recommendations nor conclusions of the EPA. It is the property of the EPA and is loaned to your agency; it and its contents are not to be distributed outside your agency.

United States Environmental Protection Agency
Criminal Investigation Division
Investigative Activity Report

**Case Number**

0900-M107

and has held various crew positions, including 2nd Mate and 3rd Mate. Hu has been a merchant seaman since 1997. He currently works for Fleet Management. Previous employers include "V Ships". His current contract is for six to eight months. Prior to shipping out on the M/V Busan, Hu was at home for a time in China.

Hu was questioned about his time on board the M/V Busan. He stated that the ship had an uneventful voyage from Korea to the Port of Long Beach (California). He is unaware of any significant problems with the vessel or its crew during that portion of the voyage. The ship did not have any problems with its navigational equipment or during its transit in and out of the Port of Long Beach. Hu believes that there was an issue with the electronic radar on the ship's bridge while the ship was in port in Long Beach. An outside contractor came on board the ship and worked on the radar when the ship was in Long Beach.

Hu was asked to provide details about the M/V Busan's transit into San Francisco Bay on November 6, 2007. Hu explained that he and the Boson are the only two qualified lookouts to be positioned at the ship's bow as it enters or leaves a port. When the vessel was en route to the Port of Oakland, Hu and the Boson took turns as the bow lookout. Bow lookouts keep in communication with the ship's bridge via handheld radios. When communicating in that capacity, the lookouts and bridge crew speak (mostly) in Chinese. Hu recalls that that the ship entered the bay late in the day and that it was cool and overcast. He recalls seeing navigation buoys in the bay when the ship was in transit to Oakland. Hu does not specifically know who was on the bridge at this time.

When the M/V Busan arrived at the Hanjin Terminal (Port of Oakland), offloading of the ship's cargo began. Hu stated that he slept during this period for an unknown amount of time. Loading of cargo began almost immediately after the unloading operation finished. Hu directed cargo loading operations through the night and claims that he was well rested. During cargo loading operations, the 2nd and 3rd Mates report directly to Hu. Under other circumstances, they report directly to Captain Sun.

When the vessel was ready to depart in the morning of November 7, 2007, Hu recalls that it was daylight and that visibility was only approximately 70 to 80 meters due to fog. Hu is uncertain of what time it was when the ship left the Hanjin Terminal, but he recalls that visibility worsened as the ship entered the shipping channel inside San Francisco Bay. Hu and the Boson were positioned on the bow as lookouts.

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

**United States Environmental Protection Agency**
**Criminal Investigation Division**
**Investigative Activity Report**

Case Number
0900-M107

Hu recalls that after starting out slowly, the ship began to travel "faster and faster", eventually reaching a speed of approximately 15 to 16.5 knots. Hu was able to approximate the speed of the vessel based on his professional experience and years at sea. Hu recalls looking for (but not being able to see) navigational buoys in the shipping channel. Hu recalls having a conversation with the Boson about the heavy fog. Hu recalls telling the Boson that the ship would not be moving if these foggy conditions were present in a Chinese port. Hu saw a small boat pass in the opposite direction, as the M/V Busan traveled outbound. Due to the fog, Hu was unable to tell when the ship was maneuvering.

Hu stated that as the ship was moving in the shipping channel, the battery in his handheld radio began to fade. Hu instructed the Boson to stay and remain as the lookout on the bow. Hu went to get something to eat and was then smoking in a lounge when he felt (but did not hear) the ship impact something. At the time, Hu was seated. He did not see the ship impact the San Francisco Bay Bridge. Hu ran to the starboard side and did not observe any damage to the ship. When he ran to the port side, he observed damage to the hull of the ship. Oil was streaming down the port side of the ship "in a very wide path". Hu immediately went to the ballast control room and ordered the operator there to pump water into the starboard ballast tank in an effort to raise the port side of the ship. Hu hoped to stop or reduce the amount of oil leaking from the ship by raising the port side oil tank. Hu then advised Captain Sun of this action.

After the ship anchored, Hu is aware that Captain Sun ordered damaged area to be inspected and for soundings to be taken of the ship's oil and water ballast tanks. The ship's crew was able to determine that oil was not leaking into the ship or other ballast tanks. Hu recalls seeing a USCG boat arrive at the M/V Busan after the accident. Hu did not see or interact with the Pilots that came on board the vessel at any point during the vessel's time in San Francisco Bay or the Port of Oakland.

Hu has not discussed the incident with Captain Sun, nor has he overheard any comments made by Sun about why the ship impacted the bridge. Hu has not sailed with Captain Sun prior to this voyage, but stated that he seemed to be a competent 'veteran' captain. Hu opined in the interview that the incident occurred because the ship was traveling "too fast" in "too much fog".

This document contains neither recommendations nor conclusions of the EPA. It is the property of the EPA and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# Exhibit  2B

**United States Environmental Protection Agency**
**Criminal Investigation Division**
**Investigative Activity Report**

**Case Number**
0900-0389

**Case Title:**
M/V COSCO Busan

**Reporting Office:**
San Francisco, CA, Area Office

**Subject of Report:**
INTERVIEW OF KONG XIAN HU ON MAY 22 AND MAY 23, 2008.

**Activity Date:**
June 3, 2008

**Copies to:**

**Related Files:**

**Reporting Official and Date:**
Scot R. Adair, SAGT
03-JUN-2008

**Approving Official and Date:**
Nicholas J. Torres, SAC
04-JUN-2008
*Approved by: Jay M. Green, ASAC*

#1

## SYNOPSIS

06/03/2008 - On the above referenced dates, Kong Xiang Hu was interviewed
by EPA-CID SA Scot Adair and Department of Justice Trial Attorney Richard
Udell at the United States Attorney's Office, San Francisco. Tim Farley,
USCG was present for the interview on May 22, 2008. Hu's attorney, John
Howden was on both days. DOJ contract interpreter Amy Lo provided
translation services on both days. Hu was previously interviewed by EPA-
CID in November, 2007. Hu was the Chief Officer aboard the COSCO Busan
(hereafter, Busan) when it allided with the San Francisco Bay Bridge on
November 7, 2007.

## DETAILS

Prior to the interview, Howden and Udell agreed that Hu would be
interviewed under the conditions and authority of the original limited
immunity from prosecution proffer agreement signed by Hu in November,
2007.

Starting at approximately 1530 on May 22, 2008, Hu provided the following
information; he recalls that Fleet Management representatives asked many
of the Busan's officers (including Hu) to sign "many documents" after the
Busan allided with the bridge on November 7, 2008. Hu believes that some
of these documents related to an "internal audit" done by Fleet
Management personnel. Fleet Management is the operator of the Busan. The
audit was led by Superintendent Mishra. Hu is uncertain of Mishra"s
nationality, but describes Mishra as "Indian".

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

United States Environmental Protection Agency
Criminal Investigation Division
Investigative Activity Report

**Case Number**
0900-0389

Hu was informed by Shun Biao Zhao (ship's Second Officer) that he (Zhao) had been ordered to create a false "Passage Plan" after the Busan hit the bridge. This order came from Superintendent Rana (phonetic), a Fleet Management representative. Rana arrived on the Busan on the same day of the bridge allision, but after the incident. Hu believes that Rana is employed as a higher-ranking Superintendent than the other Superintendents that sailed on the ship from Pusan, Korea, to San Francisco in October/November, 2007. Rana is also described by Hu as appearing "Indian". Rana was on the Busan for "a long time" when it was undergoing repairs in San Francisco. Hu is does not know when Rana left the Busan.

Zhao told Hu that Rana ordered him (Zhao) to create a falsified Passage Plan after Rana came aboard the Busan. Hu recalls that Zhao asked him to sign the falsified Passage Plan "two to three days after" the November 7, 2007, bridge allision. Hu is uncertain of what information was changed or different on the falsified Passage Plan, but recalls that its appearance was different than the original Passage Plan he signed before the Busan left Oakland on November 7, 2007. Hu does not recall if the original Passage Plan took the ship from "port to port" or "berth to berth". Zhao admitted to Hu that he had been ordered by Rana to create the false document using the Fleet Management format. Hu stated that the falsified Passage Plan he signed looked "similar" to the Passage Plan shown to him by the reporting agent (see Attachment #1). Hu is uncertain if this Passage Plan (Attachment #1) is the same document he signed at Zhao's request. Hu does recall that the original (pre-allision) Passage Plan was "only two to three pages" long. Hu does not know if USCG investigators took either of the Passage Plans from the Busan. Hu does not know if the coordinates in the original Passage Plan were accurate. He did not examine the document that closely prior to signing it on November 7, 2007.

When Hu asked Zhao why Rana had ordered him to create a new false Passage Plan, Zhao replied that Rana had informed him that the original one was "incomplete" and that it did not conform to ISM and Fleet Management procedures. Zhao told Hu that Rana wanted to provide additional information for the on-going investigation. Hu recalls telling Zhao that the original Passage Plan was the better document of the two because it is the one used prior to the allision. Hu and Zhao also discussed that the new Passage Plan contained false information and that it was wrong to create the document under those circumstances. As Zhao was working on the computer (on the ship's bridge), he informed Hu of Rana's order to create

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

**United States Environmental Protection Agency**
**Criminal Investigation Division**
**Investigative Activity Report**

**Case Number**
0900-0389

the new Passage Plan. Aside from Zhao's concerns about creating a false document, he was angry at having to do additional work.

Hu also had a conversation with Hong Zhi Wang (ship's Third Officer) about Zhao's creation of a falsified Passage Plan. Hu recalls Wang stating that it was "obvious" that the new Passage Plan was a "false copy" and that it was wrong to generate the document. Wang also expressed a concern that if USCG officials took the original Passage Plan, that they would get into trouble. Wang suggested to Hu that he did not sign the falsified Passage Plan. Hu does not know if Wang signed it or not. Hu does not recall ever discussing the falsified Passage Plan with the ship's Master, Sun Mao Cai.

Hu was asked if he was aware of other documents falsified or generated after the November 7, 2007, allision. Hu stated that in the morning of November 8, 2007, he was instructed by Superintendent Singh to write a statement detailing his activity leading up to the bridge allision. Hu complied and wrote a statement (in English) that he left on the ships' bridge for Singh to retrieve. In this statement, Hu stated that he was on the deck immediately prior to the allision. In reality, Hu was eating in the officer's break room. Hu was concerned that he would be criticized for being inside (and not on the deck) when the ship hit the bridge. Hu claims that he was not assigned to be a look out on the bow of the ship, but that he did spend some time there prior to the allision. It was on the bow that Hu had a discussion with Liang Xiang Zheng (ship's Bosun and the assigned look out) about the Busan traveling too fast in heavy fog. In Hu's written statement, he indicated that he "heard" the Busan impact the bridge. In reality, Hu felt the impact when he was inside the officer's break room. He did not hear the impact.

Hu also clarified that he did take over the role of lookout on the bow when Bosun Zheng left the bow to lower the Pilot Ladder. Hu was not alone on the bow for a long period of time, but did communicate with Master Sun (via hand held radio) on at least one occassion during this period of time.

Hu stated that he agreed to sign a "Statement of Facts" memo (see Attachment #2) only after a correction was made to the original memo. Hu stated that the original version of the memo indicated that it was Hu that warned the bridge crew (via hand held radio) that the bridge was in sight and that the ship was on an allision course. Hu informed Master Sun that the memo was inaccurate and that it was Bosun Zheng that had issued

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

United States Environmental Protection Agency
Criminal Investigation Division
Investigative Activity Report

Case Number
0900-0389

the verbal warning, not Hu. The correction was made in the document and
then it was presented it to Hu for his signature. Hu, Wang, Zheng, and
Able Bodied Seaman Li signed the document at Sun's request.

Hu claims that he is not certain if the ship's San Francisco Bay
navigational chart was altered after the allision. He does not know if
the chart had information altered, erased, or added. Hu stated that he is
aware that there was another audit conducted on board the Busan within
days of the bridge allision. In addition to the Fleet Management audit,
the insurance company Germanischer Lloyd conducted a separate audit. Hu
is uncertain of the Germanischer Lloyd audit findings. Hu added that
after meeting with his attorney (Howden) for the first time, he declined
to sign documents presented to him for signature by Fleet Management
personnel.

Starting at approximately 0930 on May 23, 2008, Hu provided the following
information; he reiterated that he is uncertain if information was added
to, or erased from, the ship's chart used to navigate San Francisco Bay.
Hu does recall seeing the chart on the bridge of the Busan after the
November 7, 2007, allision. At approximately 1000 to 1100, Hu examined
the chart briefly. He looked at it because he believed that the bridge
allision may have resulted from the ship following the wrong course
through the bay.

The reporting agent showed Hu a photograph of the chart in question.
After examining the chart, Hu stated that he believes that notations of
time may have been added to the "fixes" (estimated positions of the ship)
written on the chart. Hu believes that these notations of time may have
been added to the chart since he examined it after the allision on
November 7, 2007. Hu had a discussion with Wang (Third Officer) about the
two fixes indicated on the chart. When Hu asked Wang why there were only
two fixes done, Wang told Hu that he was too busy with the ship's bow
thruster to do additional fixes when the ship was under way. Hu claims
that no one has admitted to adding, altering, or erasing information on
the chart. Hu admitted that doing so would be wrong. Hu stated that it is
possible that information was added, altered, or erased.

Hu was questioned again about the statement he wrote that detailed his
activities prior to the November 7, 2007, allision. Hu confirmed that
Superintendent Singh asked him for a written statement and that he wrote
the document by hand. Hu stated that no one told him what to write, but
that Singh did advise him to "tell the truth". Hu recalls that after he

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

OCE Form 008(3/98)        Original: Case File  Copy: SAC Office Copy: HQ        Page 4 of 5

**United States Environmental Protection Agency**
**Criminal Investigation Division**
**Investigative Activity Report**

**Case Number**
0900-0389

wrote it, he took the document to the Busans bridge and left it on top of a stack of documents. Hu noticed several documents that also appeared to be hand-written statements from other crew members. Hu did not examine any of those documents long enough to assertain who wrote the statements. At no time was Hu told what to write or what to tell investigating authorities. Hu claims that at no time has the crew discussed telling investigating authorities consistent or falsified statements about the Busan, Fleet Management, or the bridge allision.

Hu stated that he met with Superintendent Mishra on two occasions during the Fleet Management audit process. On one occasion, he met with Mishra privately for approximately one hour. On the other occasion, Mishra met with Hu and other Busan crew members as a group. Hu does not recall Mishra ever asking him about the bridge allision. Hu stated that the audit was not triggered by the allision, but rather the change in the ship's ownership. Hu does not know of Mishra knew about the falsified Passage Plan ordered by Rana and generated by Zhao.

Hu confirmed that as Chief Officer, he was second in command of the Busan on November 7, 2007. His responsibilities included navigation of the vessel when it was at sea. Hu does not know who is Master Sun's supervisor. Nor does Hu know what the chain-of-command or corporate structure is for Fleet Management.

Hu stated that he was busy during the cargo unloading and loading process that took place on the Busan on November 6 and November 7, 2007. He claims that he took a break in the ship's Ballast Control Room and sat in a chair for a time. He did not sleep, but he did get some rest.

Hu stated that Singh provided some training on board the Busan when it was in transit between Pusan, Korea, and Long Beach. That training included navigation and using the ship's electronic chart system. Hu subsequently used the electronic chart system, but did not ever change the machine's settings. Hu had not used this particular electronic chart system before, but did not have any problems with using the system.

**ATTACHMENT**
HU IAR Attachments

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

# PASSAGE PLAN

## FROM:OAKLAND          TO:PUSAN     VOY:013W

### A. GENERAL

TARGET SPEED: 24KTS          TARGET RPM: 106RPM
CONSUMPTION: F.O. 219/DAY  D.O. 8/DAY

TOTAL  DISTANCE: 4980          TOTAL STMING TIME: 205HRS
TOTAL CONS: F.O. 219     M/T / D.O.57,8     M/T    ROB: F.O.4002,4     D.O.61,9

ETD:07.NOV.07 0700LT                    ETA: 16,NOV.07 1400LT

CLOCKS:7 ADANCE

DEPARTURE DRAFT:      F= 12,12          A=12,23

ARRIVE DRAFT:      F=          A=

MAX AIR DRAFT: N/A

|  | FO | DO | LO | FW | CHEMICAL | SPARE |
|---|---|---|---|---|---|---|
| CONSUMPTION PER DAY | 219 | 8 | 1400 | 10 |  | NOT |
| TOTAL VOYAGE CONSUMPTION | 1861,5 | 68 | 11900 | 80 |  | PLANED |

## B.DEPARTURE PORT - OAKLAND

### 1.PILOTAGE INFORMATION
PILOT DISMARKING  AT  LT BUOY SF 37 45,0N 122 41,5W  AND IS AVAILABLE 24HOUR

### 2. TIDAL INFORMATION

ACROSS THE BAR , THE IN-GOING STREAM  CONVERES TOWORDS THE ENTRANCE
AND IS FELT SOON ER AROUND  POINT  LOBOS  AND POINT BONITA
GOLDEN  GATE THIE IN-GOING STREAM  SETS  VERY NEARLY STRAIGHT THROUGH
WITH  A SLIGHT TENDENCY TOWARDS THE N SHORE
WITHIN  GOLDEN GATE THE MAIN PART OF THE IN-GOING STREAM  SETS NNE AND
CANSES  SWIRLS FROM GOLDEN GATE AS FAR E AS  ALCATRAZ ISLAND AND ANGEL
ISLAND
IN DETAIL INFORMATION SEE ADS NP 8 (P10.42)                    PAGE1

USVCOS0002312

ATTACHMENT 1 B

## 3. PROCEDURE

ON DROPPING PILOT THE VESSEL IS TO COMMENCE SEA PASSAGE BY
ALTERING COURSE TO ST'D AND FOLLOWING THE COURSES LAID DOWN.
CARE TO BE TAKEN OF TRAFFIC .

## 4. REPORTING

CALL SAN FRANCISCO PILOT WHEN PASSING REPORTING LINE
CALL SAN FRANCISCO TRAFFIC WHEN PASSING REPORTING LINE
WHEN PASSING LT.BOUY "N"
WHEN PASSING SEAWARD END
WHEN PASSING 38NM OFF Mt.TAMALPIS

## 5. WEATHER CONDITIONS

MORE LOW PRESSURE TRACKING E-NE/WARD ACROSS THE S-ERN GULF
OF ALASKA TO AVOID ING EXPOSURE TO THE HEAVIEST W'LY CONDITIONS

## C. CHARTS AND PUBLICATIONS

BA CHARTS:
558 591 229 4801 4806 4810 4813 3336 1500 1501 4512 4511 1803
1800 1340 2293 1329 2347 3666 127 1065 1259
LIST OF LIGHTS: VOL K
PLANNING CHART
4008
GENERAL CHART
4050 4053 4509
PILOT VOLS: VOL.8
LIST OF LIGHTS: VOL G
TIDE TABLES: VOL.4

ALRS: 281 VOL(1)   286 VOL6(5)   286VOL6(4) .

MISCELLANEOUS: N/A

ATTACHMENT 1 c

## 3. PROCEDURE

ON DROPPING PILOT THE VESSEL IS TO COMMENCE SEA PASSAGE BY
ALTERING COURSE TO ST'D AND FOLLOWING THE COURSES LAID DOWN.
CARE TO BE TAKEN OF TRAFFIC .

## 4. REPORTING

CALL SAN FRANCISCO PILOT WHEN PASSING REPORTING LINE
CALL SAN FRANCISCO TRAFFIC WHEN PASSING REPORTING LINE
WHEN PASSING LT.BOUY "N"
WHEN PASSING SEAWARD END
WHEN PASSING 38NM OFF Mt.TAMALPIS

## 5. WEATHER CONDITIONS

MORE LOW PRESSURE TRACKING E-NE/WARD ACROSS THE S-ERN GULF
OF ALASKA TO AVOID ING EXPOSURE TO THE HEAVIEST W'LY CONDITIONS

## C.CHARTS AND PUBLICATIONS

BA CHARTS:
558 591 229 4801 4806 4810 4813 3336 1500 1501 4512 4511 1803
1800 1340 2293 1329 2347 3666 127 1065 1259
LIST OF LIGHTS: VOL K
PLANNING CHART
4008
GENERAL CHART
4050 4053 4509
PILOT VOLS: VOL,8
LIST OF LIGHTS: VOL G
TIDE TABLES: VOL4

ALRS: 281 VOL(1)  286 VOL6(5)  286VOL6(4) .

MISCELLANEOUS: N/A

# BERTH TO BERTH

Attachment 1 D

| No | LATITUDE | LONGITUDE | CO (T) | DIST | DTG | CHART NO | POSITION PLOTTING INTERVAL | PRIMARY POSITION FIXING | UKC (M) | MIN CPA | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 37 47,9N | 122 19,7W |  | 1,6 | 0 | 588 | 10MIN | RDR/VISL | 3 | 0.2' | BERTH |
| 2 | 37 48,2N | 122 21,7W | 281 | 0,5 | 1,6 | 588 | 10MIN | RDR/VISL | 1 | 0.2' |  |
| 3 | 37 48,0N | 122 22,3W | 247 | 2,9 | 2,1 | 588 | 10MIN | RDR/VISL | 0,8 | 0,2 |  |
| 4 | 37 49,9N | 122 25,0W | 312 | 0,7 | 5 | 588 | 10MIN | RDR/VISL | 1,2 | 0,2 |  |
| 5 | 37 50,0N | 122 25,9W | 278 | 1,6 | 5,7 | 588 | 10MIN | RDR/VISL | 2 | 0,2 |  |
| 6 | 37 49,4N | 122 27,8W | 248 | 0,8 | 7,3 | 588 | 10MIN | RDR/VISL | 10 | 0,2 |  |
| 7 | 37 49,3N | 122 28,8W | 263 | 4,4 | 8,1 | 588 591 | 10MIN | RDR/VISL | 42 | 0,2 |  |
|  | 37 47,3N | 122 33,8W | 243 | 3,4 | 12,5 | 588 591 | 10MIN | RDR/VISL | 1 | 0,2 |  |
| 9 | 37 46,0N | 122 37,8W | 248 | 2,2 | 15,9 | 591 | 30MIN | RDR/VISL | 1 | 0,5 | P/S |
| 10 | 3745,0N | 122 40,2W | 242 | 27,3 | 18,1 | 591 | 1HOUR | GPS | 3000 | 2 |  |
| 11 | 38 00,0N | 123 09,0W | 303 | 421,6 | 45,4 | 591 4801 | 1HOUR | GPS | 3600 | 2 |  |
| 12 | 42 41,0N | 130 00,0W | 312 | 523,9 | 467 | 4801 4810 | 1HOUR | GPS | 3000 | 2 |  |
| 13 | 47 49,6N | 140 00,0W | 306 | 444,3 | 991 | 4810 | 1HOUR | GPS | 2800 | 2 |  |
| 14 | 51 23,0N | 150 00,0W | 299 | 391,4 | 1435 | 4810 1500 | 1HOUR | GPS | 3200 | 2 |  |
|  | 53 42,7N | 160 00,0W | 291 | 88,4 | 1827 | 4810 3338 | 30MIN | RDR/VISL | 30 | 1 |  |
| 16 | 54 07,0N | 162 24,0W | 286 | 121,3 | 1915 | 4810 3336 4813 | 1HOUR | RDR/VISL | 200 | 2 |  |
| 17 | 54 25,0N | 165 49,0W | 278 | 146,7 | 2036 | 3336 4813 1500 | 1HOUR | RDR/VISL | 300 | 2 |  |
| 18 | 54 40,0N | 170 00,0W | 276 | 347 | 2183 | 4813 1500 1501 | 1HOUR | RDR/VISL | 600 | 2 |  |
| 19 | 54 40,0N | 180 00,0W | 270 | 358 | 2530 | 4512 | 1HOUR | GPS | 600 | 2 |  |
|  | 53 35,0N | 170 00,0E | 259 | 495 | 2888 | 4511 | 1HOUR | GPS | 390 | 2 |  |
|  | 50 00,0N | 158 00,0E | 244 | 442 | 3384 | 4511 1803 | 1HOUR | GPS | 300 | 2 |  |
| 22 | 45 00,0N | 150 00,0E | 227 | 358 | 3826 | 4511 1340 1803 | 30MIN | RDR/VISL | 50 | 1 |  |
| 23 | 41 38,0N | 143 15,0E | 236 | 107 | 4184 | 2293 1329 2347 3666 | 30MIN | RDR/VISL | 40 | 1 |  |
| 24 | 41 38,0N | 140 52,0E | 270 | 32,5 | 4291 | 1329 23473666 127 | 30MIN | RDR/VISL | 40 | 1 |  |
| 25 | 41 19,5N | 140 16,5E | 235 | 649 | 4323 | 1065 | 1HOUR | GPS | 1000 | 2 |  |
| 26 | 35 01,7N | 129 07,5E | 234 | 4,2 | 4972 | 1259 | 10MIN | RDR/VISL | 70 | 0,7 | P/S |
| 27 | 35 01,7N | 129 02,4E | 270 | 2 | 4976 | 1259 | 10MIN | RDR/VISL | 20 | 0,5 |  |
| 28 | 35 03,0N | 129 00,5E | 310 | 0,6 | 4978 | 1259 | 10MIN | RDR/VISL | 3 | 0,5 |  |
| 29 | 35 03,5N | 129 00,1E | 327 | 0,6 | 4979 | 1259 | 10MIN | RDR/VISL | 1 | 0,,2 |  |
| 30 | 35 04,0N | 128 59,8E | 334 |  | 4979,4 | 1259 | 10MIN | RDR/VISL | 2 | 0,2 | BERTH |

PAGE 3

USVCOS0002315

ATTACHMENT 1 E

## D. ENGINE AVAILABILITY/STANDBY

ON THIS VESSEL THE ENGINE ROOM IS ALWAYS MANNED AND BEING GOOD
ORDER, THE ENGINES ARE ALWAYS AVAILABLE FOR MANOEUVERING AT
PORT NOITICE.

## E. AREAS WHICH REQUIRE SPECIAL ATTENTION FOR CROSSING TRAFFIC/END ON TRAFFIC.

VSL ENTER INTO TSS AND RNAS SHOULD REPORT SAILING PLAN  AND POSITION
PLAN   IN DETAIL SEE ALRS VOL 6(5) P386 AND P387

USVCOS0002316

ATTACHMENT 1F

# TIDAL INFORMATION

| OAKLAND | |
|---|---|
| 06-Nov | |
| 0229 | 0,4 |
| 0908 | 1,8 |
| 1526 | 0,2 |
| 2153 | 1,4 |
| 07-Nov | |
| 0305 | 0,5 |
| 0633 | 1,8 |
| 1602 | 0,1 |
| | |
| | |
| | |
| | |
| | |

| PUSAN | |
|---|---|
| 16-Nov | |
| 0232 | 2,3 |
| 0826 | 6,6 |
| 1430 | 1,4 |
| 2057 | 7,4 |
| 17-Nov | |
| 0316 | 2,4 |
| 0915 | 6,4 |
| 1518 | 1,7 |
| 2151 | 7,2 |
| 18-Nov | |
| 0413 | 2,6 |
| 1023 | 6,1 |
| 1621 | 2 |
| 2302 | 6,9 |

USVCOS0002317

ATTACHMENT 1G

# F. ARRIVAL PORT - PUSAN

## 1.PILOTAGE INFORMATION

CALL PUSAN  PILOT 3 HRS. IN ADVANCE OF ETA ON VHF CH13
PILOT IS COMPULSORY FOR VESSELS OVER 500GT
DETAIL SEE ALRS VOL 6(4) P283

## 2. TIDAL INFORMATION

MEAN SPRING RANGE ABOUT 1.1M; MEAN NEAP RANGE ABOUT 0.5M

## 3. WEATHER

THE WEATHER IN PUSAN IS NORMALLY FINE WITH NE PUSAN WIND. VISIBILITY
IS SEVERELY AFFECTED DURING RAIN AND FOG, SPECIAL CARE IS TO BE TAKEN
AT SUCH TIME.

## 4.REPORTING

VESSEL TO REPORT TO PUSAN PORT SERVICE WHEN PASSING REPORTING POINT
MARKED ON BA CHART 1259

## 5.PROCEDURE

VTS REPORT PROCEDUE  HAVE1) ESTIMATED  ARRIVED REPORT 2)INITIAL  REPORT
3)ARRIVED REPORT 4) SHIFTING REPORT 5)DEPARTURE REPORT .THESE REPORT
IS COMPULSORY FOR FOREIGN  VSL DETAIL  SEE ALRS VOL 6(4) P283 285

## SALIENT FEATURES DURING THE VOYAGE:

1. ENSURE NAVIGATIONAL EQUIPMENT ARE TESTED BEFORE 1 HOUR DEP
 CHECK LIST SHOULD BE COMPLETED  AND KEEP SHARP
LOOK OUT FOR OTHER VESSELS APPROACHING OR DEPARTING.

2.VESSEL NAVIGATED ALONG COAST, COAST CURRENT VERY
 PAY ATTENTION TO IT,KEEP VESSEL ON TRACK.

MASTER          CH. OFF          2ND OFF.          3RD OFF

PAGE 6

USVCOS0002318

ATTACHMENT 14

Fleet Management Europe Limited
*A member Of The Noble Group*

## BRIDGE MANAGEMENT TEAM

### 1. GOOD VISIBILITY AND OPEN SEA DAY LIGHT

|  | 0000 - 0400 & 1200 - 1600 | 0400 - 0800 & 1600 - 2000 | 0800 - 1200 & 2000 - 2400 |
|---|---|---|---|
| INCHARGE | 2/O | C/O | 3/O |
| ASSISTING | -- | -- | -- |
| LOOKOUT | -- | -- | -- |
| HELSMAN | -- | -- | -- |

### 2. GOOD VISIBILITY AND OPEN SEA NIGHT TIME

|  | 0000 - 0400 & 1200 - 1600 | 0400 - 0800 & 1600 - 2000 | 0800 - 1200 & 2000 - 2400 |
|---|---|---|---|
| INCHARGE | 2/O | C/O | 3/O |
| ASSISTING | -- | -- | -- |
| LOOKOUT | A/B | A/B / CADET | A/B |
| HELSMAN | -- | -- | -- |

### 3. CONGESTED WATERS

|  | 0000 - 0400 & 1200 - 1600 | 0400 - 0800 & 1600 - 2000 | 0800 - 1200 & 2000 - 2400 |
|---|---|---|---|
| INCHARGE | MASTER | MASTER | MASTER |
| ASSISTING | 2/O | C/O | 3/O |
| LOOKOUT | OS 1 | OS 2 | AB |
| HELSMAN | A/B | A/B | AB |

### 4. RESTICTED VISIBILITY / MAKING PORT

|  | 0000 - 0400 & 1200 - 1600 | 0400 - 0800 & 1600 - 2000 | 0800 - 1200 & 2000 - 2400 |
|---|---|---|---|
| INCHARGE | MASTER | MASTER | MASTER |
| ASSISTING | 2/O | C/O | 3/O |
| LOOKOUT | OS 1 | OS 2 | AB |
| HELSMAN | AB | AB | AB |

Master, M.V. "COSCO BUSAN"

** Above schedule is for guidelines and can be override by Master's discretion in case of Emergency / Urgency.

Room 1703 17th Floor, MassMutual Tower, 38 Gloucester Road, Hong Kong
Tel (852) 2861 3511   Fax (852) 2528 1550   Telex 79611 FLTMG
E-mail fml@fleetship.com

USVCOS0002319

STATEMENT OF FACTS

To: Parties Concern
From: COSCO BUSAN
Date: 07 November 2007

Dear Sir,

m/v COSCO BUSAN/VRDI6 Registered in Hongkong called Oakland on 6 nov.2007 for loading and unloading containers, on 7th nov.2007 0600lt the cargo work has completed, and ship is ready for sailing, at about 0620lt the pilot come on board , 0748lt all line cast off, we sailed from berth (TTI 55/56), under command by the pilot, that time the visibility is poor but no other traffic, we have got both anchor ready and the chief officer and boatswain standby at fore deck ,the whistle has properly sound ,the radars has operated in good working condition, main engine ,steer gear ECDIS , echo sounding, rudder indicator, main engine RPM indicator Bow thruster all in good working condition, at about 0829 lt forward called by walky-talky says that He found bridge pier and the ship was too close to it, the pilot was noted the situation and given the order to hard starboard but it too late, at 0830lt my ship's port side has touched with the bridge pier ,caused my ships FO tank No 3p, No 4p and No2 water heeling tank heavily damaged and fuel oil spilled out from the tank,

Once the accident happened we have notified USCG immediately and called agent in no time and called MSRC, QI, DPA etc and commenced to transfer fuel oil to other tanks from the leaking tanks, and adjust ballast water to keep ship list to starboard side in order to reduce fuel oil spilling, the ship was proceed to anchorage for investigation, at 1105lt the ship was shifted to No9 anchorage under command by another pilot.

As per initial check, my ship's port side hull damaged about 67 meters in length and about 3 m in height located about 2.5 meters above water from frame 128 to 150 ,the exact damages depend futher checked/inspected by surveyor and total quantity fuel oil spilled to be calculated after all oil was transferred to another tanks,

No body injured /death in this accident.

Master of COSCO BUSAN: Sun maocai

Witness :

Chief officer: hu kongxiang
Third officer: Wang hongzhi
A.B : Li zongbin
Boatswain : zheng liangxian

USVCOS0002364

Exhibit  3

# ZHAO  SUN  BIAO
## Second Mate

Exhibit 3A

**United States Environmental Protection Agency**
**Criminal Investigation Division**
**Investigative Activity Report**

**Case Number**
0900-0389

**Case Title:**
M/V COSCO Busan

**Subject of Report:**
INTERVIEW WITH ZHAO SHUN BIAO ON DECEMBER 13, 2007

**Reporting Office:**
San Francisco, CA, Area Office

**Activity Date:**
January 7, 2008

**Copies to:**

**Related Files:**

**Reporting Official and Date:**
Scot R. Adair, SAGT
[pending]

_Jaw R.__ 1.7.08

**Approving Official and Date:**
Nicholas J. Torres, SAC
[pending]

**SYNOPSIS**

01/07/2008 - On the above referenced date, Zhao Shun Biao was interviewed at the United States Attorney's Office, San Francisco. EPA-CID SA Scot Adair, Coast Guard Investigative Service (CGIS) SA Carl Cross, Assistant United States Attorney Stacey Geis, David Joyce (DOJ Environmental Crimes Section), and United States Coast Guard Attorney Chris Tribolet were present for the interview. Zhao's attorney, John Howden was also present. DOJ contract interpreter Amy Lo provided translation services.

**DETAILS**

Prior to the interview, Zhao (in consultation with Howden) read and signed a limited immunity from prosecution proffer agreement provided by AUSA Geis.

Zhao provided the following information: he has been a professional mariner since March, 2003. Zhao started his career as a cadet and then was promoted to the position of 3rd Mate (2005). Until recently, Zhao was the 2nd Mate on the M/V COSCO Busan. Prior to boarding the M/V Busan on October 27, 2007, Zhao worked for Vanguard Shipping, Singapore. Zhao was the 3rd Mate on the Vanguard vessel Sea Rex Nova.

As 2nd Mate aboard the M/V Busan, Zhao's primary responsibilities included the creation of the ship's Passage Plan. Zhao was also tasked with maintaining certain equipment on the bridge of the M/V Busan. Zhao worked two shifts each day on the bridge of the M/V Busan; 1200 to 1600 and 0000 to 0400.

Zhao explained that the Passage Plans always chart the route the vessel

This document contains neither recommendations nor conclusions of the EPA. It is the property of the EPA and is loaned to your agency; it and its contents are not to be distributed outside your agency.

OCE Form 008(3/98)

**Original: Case File  Copy: SAC Office Copy: HQ**

**United States Environmental Protection Agency**
**Criminal Investigation Division**
**Investigative Activity Report**

Case Number
0900-0389

will take from "port to port". The Passage Plan he generated for the M/V Busan's transit from Pusan, Korea, to Long Beach, California, and then Oakland, California, covered navigational needs from port to port. Zhao added that because the M/V Busan's normal route takes it to Long Beach and Oakland on a regular basis, the Passage Plan on the vessel is well established. Zhao examined the ship's previous Passage Plan, confirmed that the waypoints were accurate, and made certain that the plan was complete. Zhao stated that he confirmed the accuracy of the waypoints in the existing Passage Plan by checking them against those found in printed charts. In checking them, Zhao stated that he found them to be accurate.

Zhao was asked if he recognized the chart in a photograph shown to him by the reporting agent (see Attachment #1). Zhao stated that is was a photograph of the chart used on the M/V Busan. He added that it was a part of his Passage Plan and that he "plotted" the course drawn on the chart. Zhao explained that the pencil line and the waypoints shown on the chart were already drawn on the chart; he simply checked the plotted course and waypoints for accuracy. Zhao used a special compass (described as a "two triangle ruler") to check the drawn line for accuracy. Zhao found the line and the waypoints to be accurate. Zhao also checked the plotted course against the ships navigation computer and found it to be accurate. Zhao does not know who first drew the line and original waypoints on the chart in question. Zhao claims that he did not make any of the pencil marks on the chart.

After confirming the accuracy of the plotted course found on the chart, Zhao claims that he put the chart on the chart table located on the ship's bridge. He does not know if the ship's Captain (Mao Cai Sun) ever examined or looked at the chart. Zhao is uncertain of exactly when he confirmed the accuracy of the chart, but recalls that he did so when the ship was in transit to Oakland from Long Beach.

Zhao stated that he looked at the chart again before the ship left Oakland on the morning of November 7, 2007. He again checked the plotted line and waypoints for accuracy before the ship departed Oakland. Zhao found the information to be accurate.

Zhao was shown another photograph of the chart in question (see Attachement #2. Reporting agent's note; this photograph shows a detailed portion of the San Francisco Bay Bridge and surrounding area). Zhao was asked if he recognized the Raycon symbol located between the Delta and Echo towers of the Bay Bridge. Zhao responded in the affirmative. Zhao

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

**United States Environmental Protection Agency**
**Criminal Investigation Division**
**Investigative Activity Report**

Case Number

0900-0389

stated the Raycon transmits a signal that is picked up on the ship's radar. This transmission helps to fix the ship's position against the Raycon. When asked if he knew if the Raycon should be aimed for or avoided by a passing ship, Zhao responded that he was uncertain. Zhao opined that the plotted course on the chart took the vessel to the side of the Raycon in case the device was located in the water, instead of on the bridge itself. Zhao kept the course the way it was drawn because he did not want the M/V Busan to "run over" the Raycon if it was, in fact, located in the water. Zhao stated that he is not familiar with the typical use and placement of Raycons on or near bridges. Nor is he familiar with how Raycons are placed at sea (or if they are placed on buoys). Zhao is very familiar with the Raycon symbol (described as a solid dot surrounded by circular checked line) and that the symbol represents the existence of a Raycon. Zhao recalls noticing the Raycon symbol located on the chart between the Delta and Echo towers of the Bay Bridge. He noticed the symbol before the ship entered the Port of Oakland on November 6, 2007.

Zhao stated that he was assigned to man the M/V Busan's stern as a lookout when the ship left the Port of Oakland on November 7, 2007. He does not know if anyone on the ship's bridge (including the Pilot, Captain Sun, the 3rd Mate, or the Helmsman) examined the chart before the ship left Oakland. Zhao never saw the Pilot that came on board the vessel on November 7, 2007. The plotted chart and the Passage Plan are to be used by the Pilot as a reference tool. Zhao does not know what was happening on the bridge of the ship when it hit the Delta tower of the Bay Bridge later that morning.

Zhao went on duty on the bridge in the afternoon of November 7, 2007. He is uncertain if he examined the chart on that day, but recalls looking at it the following day, November 8, 2007. Zhao stated that he plotted waypoints #1, #2, #3, #4, and #5 on the chart while the ship was at anchor. When asked why he did so at that late date, Zhao replied that he had "done an incomplete job" plotting the course before leaving Oakland on November 7, 2007. Zhao denies adding or deleting anything else from the chart after the bridge impact. Zhao denies "scrubbing" or erasing the pencil marks off of the chart sometime after the bridge impact. He does not know who did so. Zhao admitted that he may have erased one or more of the original "fix marks" written on pencil from a previous voyage when he plotted waypoints #1 through #5 on November 8, 2007. At some point, Zhao recalls the 3rd Mate informing him that the chart was no longer on the bridge and that its location was unknown.

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

**United States Environmental Protection Agency**
**Criminal Investigation Division**
**Investigative Activity Report**

Case Number
0900-0389

As a part of his original Passage Plan, Zhao referenced several nautical books, including "Sailing Direction" and "Radio List". Zhao recalls that one or more of these books indicated that vessel traffic should transit through the Delta tower Echo tower span of the Bay Bridge.

Zhao stated that he was trained at his maritime University to take fixes on board ships. He was not trained to do so on board the M/V Busan. When asked how often fixes should be taken on a ship with a Pilot on board, Zhao stated that there was no specific schedule and that it depended upon distances and traffic conditions. He added, however, that it is Captain Sun's standing order that fixes be taken every five to ten minutes while in piloted waters. Zhao does not know if fixes were taken in accordance with that order at any time the M/V Busan was in the San Francisco Bay.

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.





Exhibit  3B

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
|---------|---------------------------------------------|

SUBJ: CONTAINER SHIP (C/S) COSCO BUSAN          CCN: 0250-07GPA 0193 2X (GJ)

**Details:**

loaded the floppies into the computer and copied the information that pertained to the 2nd Officers duties. The 3rd Officer had obtained the floppies when he worked on another FLEET vessel in the past. The 2nd Officer then found the FLEET format passage plan in the documents he had copied from the floppies. It took him most of the day on 08 November 2007 to prepare the FLEET format passage plan. He worked on it until approximately 1030 hours. He then rested for a short amount of time and returned to the bridge at approximately 1200 hours to work on it again. He overheard RANA and SINGH talk about passage plans sometime during the day on 08 November 2008. SINGH noticed the 2nd Officer working on the new FLEET format passage plan and asked what he was doing. He told SINGH that RANA had told him he needed to do a berth to berth in the FLEET format. He finished the FLEET format in the late afternoon on 08 November 2007; this passage plan was for the voyage from Oakland to Pusan that should have taken place on 07 November 2007.

r. He said the work logs may not reflect the actual hours the crew works. The logs are filled out to show the crew is getting the required rest, regardless of the actual amount of hours worked.

s. ZHAO provided no further pertinent information and the interview was concluded.



58. On 24 June 2008, S/A CROSS, LCDR TRIBOLET and AUSA Jonathan SCHMIDT, USAO San Francisco, CA interviewed ZHAO at 450 Golden Gate, San Francisco, CA. ZHAO was accompanied by his attorney Mr. Jonathan HOWDEN, Ken KWAN provided translation services.

a. ZHAO provided a CRUZER Micro 4GB/USB drive **(Evidence (08) tag# 175225)**, which he claimed contained some files from the navigation computer on the COSCO BUSAN. He had copied the files to a MP3 player and later transferred them to his personal computer. He said these were only a portion of the files he had copied, but he agreed to provide a compact disk of all the files he copied.

b. He said the Oakland to Pusan passage plan was modified at approximately 0630 hours on 09 November 2007.

c. He completed the berth to berth passage plan on 08 November 2007 in the early morning hours, and finished the FLEET format passage plan in the afternoon.

d. On 09 November 2007 was the last time he knows the FLEET format passage plan was modified.

| FOR OFFICIAL USE ONLY PUBLIC AVAILABILITY TO BE DETERMINED UNDER 5 USC 552 AND 552(a) | CLASSIFICATION STAMP FOR OFFICIAL USE ONLY | PAGE _8_ OF _11_ PAGES |
|---|---|---|

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
| --- | --- |

SUBJ: CONTAINER SHIP (C/S) COSCO BUSAN          CCN: 0250-07GPA 0193 2X (GJ)

**Details:**

    e. This interview was concluded and scheduled to resume on 27 June 2008.



60.  On 25 June 2008, S/A CROSS copied the files from CRUZER USB **(EVIDENCE item (08))** to a compact disk for further review.

61.  On 27 June 2008, S/A CROSS received a Memorex CD-R **(Evidence item (09))** containing files from HOWDEN.  This CD-R is from ZHAO and is reported to contain files he copied from the navigation computer onboard the COSCO BUSAN.  S/A CROSS review the CD-R and determined that it contained various files that appeared to be from the navigation computer of the COSCO BUSAN and matched the files found on the mirror images from the COSCO BUSAN computers.

62.  On 27 June 2008, S/A CROSS, LCDR TRIBOLET and AUSA SCHMIDT, interviewed ZHAO at 450 Golden Gate, San Francisco, CA.  ZHAO was accompanied by his attorney Mr. Jonathan HOWDEN, KWAN provided translation services.

    a. ZHAO said on 24 October 2007 they arrived on the COSCO BUSAN in Pusan, and completed safety and fire drills in preparation for getting underway.  They sailed from Pusan on 25 October 2007.  The passage plan they used on their voyage from Pusan was a pilot to pilot (waypoint for windows).  This passage plan was not created until 02 November 2007, several days after they had departed Pusan.

    b. He did not recall SINGH talking to him about passage plans during the initial voyage from Pusan to LA/LB.  SINGH never showed him or told him he should use the FLEET format or berth to berth passage plans.  He received no instruction for the passage plan appraisal check sheet.  He did not fill out any passage plan appraisal check sheets until after the incident.

    c. He was shown the passage plan appraisal check sheets: Oakland to Pusan, LA/LB to Oakland, Pusan to LA/LB.  He could not positively say these contained his signature; he did confirm they contained some of his hand writing in other places on the forms.

    d. Sometime after 08 November 2007, RANA asked him why the passage plan appraisals were not filled out.  After this discussion he did not question RANA, he just filled them out.  He believes this conservation occurred on 09 November 2007.

    e. ZHAO was shown several different versions of passage plans.  He confirmed that he created all of them.

    f. He said the Oakland to Pusan, FLEET format passage plan was created on 08 November 2007, and finished at approximately 1500 hours on 09 November 2007.  He used a passage plan titled BME-SYD [39050] as the template for

| FOR OFFICIAL USE ONLY<br>PUBLIC AVAILABILITY TO BE<br>DETERMINED UNDER 5 USC 552 AND 552(a) | CLASSIFICATION STAMP<br>FOR OFFICIAL USE ONLY | PAGE _9_ OF _11_ PAGES |
| --- | --- | --- |

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
|---|---|

SUBJ: CONTAINER SHIP (C/S) COSCO BUSAN          CCN: 0250-07GPA 0193 2X (GJ)

**Details:**

creating the Oakland to Pusan passage plan titled OAK-PUS [105639].    BME-SYD [39050] passage plan contains language that reads (AUSTRALIA or BRISBANE). He told the Master about having to make new passage plans, the Master acknowledge but offered no input. He printed the completed passage plan and placed it on the navigation desk. He asked the Master and the Chief Officer to sign the plan, which they did. At this time there was a CG Officer identified as LT Bryan JOHNSON, Port State Control, CG Sector San Francisco, CA on the bridge. JOHNSON was asking for the passage plan. ZHAO asked SINGH which passage plan he should give the CG. SINGH told him to give the CG the FLEET format that was created after the incident. ZHAO did not have time to get the 3rd Officer to sign the passage plan before giving it to the CG. ZHAO signed in the position for the 2nd Officer and also signed in the position indicated for the 3rd Officer. JOHNSON noticed a problem with the passage plan the word (AUSTRALIA or BRISBANE) **(Enclosure (34))** was in the text of the passage plan. JOHNSON pointed out the problem to ZHAO. ZHAO took the passage plan and printed another copy **(Enclosure (35))**. After he had printed this copy he did not have the time to find and get the signatures of the Master, Chief Officer and 3rd Officer. So he singed this copy for everyone and gave it to JOHNSON. After the CG officers left the bridge he told SINGH about the corrected passage plan, SINGH said that he would talk to them. ZHAO assumed SINGH was referring to the CG. He thinks the Master may have seen him sign for everyone.

g. He said that the 3rd Officer, Chief Officer, SINGH, RANA and the Master know that he gave a fake and forged passage plan to the CG.

h. No one told him he shouldn't give a passage plan created after the fact to the CG. He however knew it was inappropriate to do so. He said he was nervous when he gave the FLEET format passage plan to the CG. He described that he was not nervous about giving the plan to the CG, but nervous that it might have other mistakes.

i. He kept a copy of the old passage plan with the (AUSTRALIA or BRISBANE) reference in his drawer on the ship.

j. This was the first ship he had worked on with an ECS; he read the manual for the ECS to become familiar with the equipment.

k. He provided no additional pertinent information and the interview was concluded.

63.  On 30 June 2008, S/A CROSS returned CRUZER USB **(Evidence item (08))** to HOWDEN for return to ZHAO.

64.  This Supplemental Report of Investigation is COMPLETED.

| FOR OFFICIAL USE ONLY PUBLIC AVAILABILITY TO BE DETERMINED UNDER 5 USC 552 AND 552(a) | CLASSIFICATION STAMP FOR OFFICIAL USE ONLY | PAGE  10  OF  11  PAGES |
|---|---|---|

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
|---------|----------------------------------------------|

SUBJ: CONTAINER SHIP (C/S) COSCO BUSAN          CCN: 0250-07GPA 0193 2X (GJ)

Details:



56.  On 11 June 2008, S/A CROSS, LCDR TRIBOLET and AUSA SCHMIDT, interviewed ZHAO at 450 Golden Gate, San Francisco, CA.  ZHAO was accompanied by his attorney Mr. Jonathan HOWDEN, ZHU provided translation services.

   a. He reported onboard the COSCO BUSAN in October 2007 in Pusan.  After reporting onboard the vessel he did not receive any formal training from the company or the previous crew.

   b. He has had a chance to listen to the VDR files; this helped him remember the day of the incident.

   c. ZHAO did not tell interviewers about the multiple passage plans because he did not want to get the company or others in trouble with the government.

   d. Superintendent SINGH reviewed his work during the transit from Pusan to LA/LB and from LA/LB to Oakland.  ZHAO was not told by anyone that the passage plans should be (berth to berth).  He saw the passage plans (pilot to pilot) that the previous crew had used and just followed suit.  SINGH did mention that there were new forms for the company, but he never gave them to

| FOR OFFICIAL USE ONLY<br>PUBLIC AVAILABILITY TO BE<br>DETERMINED UNDER 5 USC 552 AND 552(a) | CLASSIFICATION STAMP<br>FOR OFFICIAL USE ONLY | PAGE  5  OF  11  PAGES |
|---|---|---|

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
|---------|----------------------------------------------|

SUBJ: CONTAINER SHIP (C/S) COSCO BUSAN     CCN: 0250-07GPA 0193 2X(GJ)

Details:

ZHAO. SINGH did correct some of his work during the time that SINGH was onboard.

e. During the transit from Pusan to LA/LB they used a (pilot to pilot) passage plan because they were not familiar with the local waters and were using a pilot from the pilot station to the berth. He said he understood what pilot waters are. He believes the crew's role is to assist the pilot with the ships equipment. He said the crew could not relax when a pilot is onboard but it did make the crews' job easier, since the pilot makes all the navigational decisions and the crew just follows his orders. During the voyage from LA/LB to Oakland they again used a (pilot to pilot) passage plan.

SPECIAL AGENT NOTE:
There are three types/formats of passage plans that were produce by the 2nd Officer. 1. Pilot to Pilot passage plans cover the portion of a voyage from pilot station to pilot station. 2. Berth to Berth passage plans cover the entire voyage from berth to berth. 3. FLEET format berth to berth passage plans cover the voyage from berth to berth and also include much more detailed navigation reference information.

f. He has never talked to anyone onboard the COSCO BUSAN about the pilots not using the courses that the crew plots on the chart. From his experience no pilot ever follows the crews plotted courses. His normal duty location when entering or leaving port is on the stern of the vessel, so he is not on the bridge when the pilot is onboard.

g. Once a pilot is onboard the pilot usually explains to the Master his intentions in general. As a crew they follow the pilots' orders unless the Master gives an order. They would follow the Masters' orders over the pilot if the situation were to present itself.

h. He recalled there being three passage plans in the bridge (planning computer). These passage plans were located in folders called Old Passage Plans, Pilot to Pilot and Berth to Berth. Before the incident he changed the necessary information and printed out ones for the Pusan to Long Beach, Long Beach to Oakland and Oakland to Pusan voyages. He does not remember if he saved passage plans as new files (save verses save as).

i. After printing the Passage Plans he compared the points with the chart, global positioning system and electronic chart system. Then he would have signed the passage plan and probably have left it on the navigation desk for the Master to sign. The Master does not ask questions about the passage plans, he just usually signs them. Before he completes the passage plans he normally discusses the general plan with the Master, the Masters plan is very general in nature and does not detail courses or speeds.

j. This was his first voyage as a 2nd Officer.

k. He normally works on the bridge from 1200 to 1800 hours and then again from 0000 to 0600 hours. On 06 November 2007 he worked from 1200 to 1600 hours on the bridge. He then worked on the bridge on 07 November 2007 from 0000

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
|---|---|

SUBJ: CONTAINER SHIP (C/S) COSCO BUSAN          CCN: 0250-07GPA 0193 2X(GJ)

**Details:**

to approximately 0600 hours, at that time he was relieved by the 3rd Officer and the pilot came onboard. He had prepared a pilot to pilot (waypoint for windows) passage plan for the voyage from Oakland to Pusan. He then reported for his duty on the stern of the vessel for the voyage out of Oakland and remained there until after the ship struck the bridge tower.

l. After the incident he assisted the Chief Officer and stood-by on the main deck awaiting orders from the Master until the Master called him to the bridge at approximately 1100 hours. The Master asked him to review the VDR so that they could save the information it had recorded. He could not figure out how to save the data so he began reading the manual. He worked for most of his shift reviewing the VDR manual and trying to understand how to save the data. He did not actually work on the equipment he only tried to learn how to save the data by reading the manual. He recalled that two superintendents (SINGH and MANDILWAR) came onboard during this time. At approximately 1800 hours he was relieved by the 3rd Officer. He thinks he ate, showered and rested until approximately 0000 hours, 08 November 2008.

m. At approximately 0000 hours he returned to the bridge for his duty. Once back on the bridge he noticed that there was a technician working on the VDR. His duties during this time would be to monitor the radio, position of the ship and check the anchor. He could also work on his other jobs, such as maintaining the navigation equipment, charts, complete necessary check-list and prepare passage plans if needed.

n. Sometime near 0100 hours RANA came onboard the ship. The original pilot to pilot passage plan (**Enclosure (31)**) was on the navigation table. It is unclear as to the exact time, but he believes that RANA was on a cellular telephone with someone from the company. RANA then said to him, this is pilot to pilot; you should do a berth to berth. He felt that based on RANA's comments it should be done by the end of his duty, so he did it in a hurry. He felt uncomfortable with RANA's tone of voice.

o. He first went to the charts to determine the GPS coordinates and course for the berth to berth passage. He then went to the navigation computer and found a folder named berth to berth passage plans. He believes that he saved this passage plan (**Enclosure (32)**) on 08 November 2008 in the early morning.

p. Later that day RANA and SINGH were having conservation, RANA looked at the berth to berth passage plan and said that you can not do the passage plan in this format. RANA had him look for the bridge procedures manual, he could not find it and felt RANA was blaming him for not finding the manual. RANA found the manual and gave it to him and showed him the berth to berth passage plan in the FLEET format. He asked RANA if the company had the format in the computer. RANA said no. ZHAO was angry because he knew how much work it would be to create the FLEET format of the passage plan.

q. He believes the 3rd Officer was on the bridge at that time. At some point between 24 October 2007 and 07 November 2008 the 3rd Officer gave him three floppy disk (**Evidence (07)(tag# 175224)**) that contained FLEET documents. He

| FOR OFFICIAL USE ONLY<br>PUBLIC AVAILABILITY TO BE<br>DETERMINED UNDER 5 USC 552 AND 552(a) | CLASSIFICATION STAMP<br>FOR OFFICIAL USE ONLY | PAGE _7_ OF _11_ PAGES |
|---|---|---|

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
|---|---|

SUBJ: CONTAINER SHIP (C/S) COSCO BUSAN        CCN: 0250-07GPA 0193 2X(GJ)

**Details:**



52.  On 14 May 2008, S/A CROSS and AUSA SCHMIDT interviewed ZHAO at 101 2nd Street, San Francisco, CA.  ZHAO was accompanied by his attorney Mr. Jonathan HOWDEN.  Amy LO provided translation services.

  a. ZHAO was the 2nd Officer onboard the COSCO BUSAN on 07 November 2007.  His duties as the 2nd officer include being the navigation officer; he is also responsible for the routine maintenance of the navigation equipment on the bridge.

  b. He advised that he performs the maintenance in accordance with Global Maritime Distress and Safety System (GMDSS) guidelines.

  c. He has worked with the electronic chart system (ECS) onboard the COSCO BUSAN for approximately three weeks.  He was not aware of any problems with the ECS.  He was aware of a problem with the display of one of the radars during the COSCO BUSANs' visit to Los Angeles-Long Beach (LA/LB).  One of the superintendents had a repair technician(s) come to the vessel and correct the problem.  He was not present on the bridge when the repair work was done.  No one reported any problems with the radars after leaving LA/LB.

  d. He prepared the passage plan **(Enclosure (29))** for the COSCO BUSANs departure from Oakland, CA.  He retrieved the way-point list from the computer on the port side of the bridge.  He put this list together with the rest of the passage plan and placed the passage plan on the chart desk with the paper navigation chart.  The ECS also has a list of way-points in it; however, these points only begin once past the Golden Gate Bridge.  There were no way-points in the ECS for the courses from the berth in Oakland to the Golden Gate Bridge.

**SPECIAL AGENTS NOTE:**
The paper chart used that day does have a course plotted on it that would, if followed, have given the COSCO BUSAN safe passage through the bay.

  e. ZHAO was shown the chart item number three (003) from **(Evidence (02) Sector San Francisco, Marine Safety Casualty Investigation)**.  ZHAO verified these courses by checking them with a plotting instrument.  He did not label the various way-points on the paper chart at that time.  He did admit that he went back on 08 November 2007 and labeled the way-points as; WPT1, WPT2, WPT3, WPT4, etc….  He did not feel he was wrong by doing this but did it because of the incident and he felt that there would be questions about this.  Had the incident not happened he would not have thought about labeling these way-points.

  f. After preparing the passage plan he departed the bridge and went to the stern of the COSCO BUSAN and made preparations for getting underway.  He remained on the stern of the vessel for the duration of the transit until the incident.  He was able to see the water from his position on the stern

| CG-4608 | REPORT OF INVESTIGATION (continuation sheet) |
|---------|----------------------------------------------|

SUBJ: CONTAINER SHIP (C/S) COSCO BUSAN          CCN: 0250-07GPA 0193 2X (GJ)

Details:

of the vessel.

g. ZHAO was shown the same video clips that ZHENG was shown.  He felt that the video clip YBI 2 @ 0815:45 was the best depiction of the visibility on 07 November 2007.

h. He provided no additional pertinent information and the interview was concluded.

| FOR OFFICIAL USE ONLY PUBLIC AVAILABILITY TO BE DETERMINED UNDER 5 USC 552 AND 552(a) | CLASSIFICATION STAMP FOR OFFICIAL USE ONLY | PAGE _4_ OF _4_ PAGES |
|---|---|---|

# ASSAGE PLAN

## FROM:OAKLAND          TO:PUSAN     VOY:013W

## A. GENERAL

TARGET SPEED: 24KTS          TARGET RPM: 106RPM
CONSUMPTION: F.O. 219/DAY  D.O. 8/DAY

TOTAL  DISTANCE: 4980              TOTAL STMING TIME: 205HRS
TOTAL CONS: F.O. 219      M/T / D.O.57,8      M/T   ROB: F.O.4002,4      D.O.61,9

ETD:07.NOV.07 0700LT                  ETA: 16,NOV.07 1400LT

CLOCKS:7 ADANCE

DEPARTURE DRAFT:      F= 12,12              A=12,23

ARRIVE DRAFT:          F=              A=

MAX AIR DRAFT: N/A

|  | FO | DO | LO | FW | CHEMICAL | SPARE |
|---|---|---|---|---|---|---|
| CONSUMPTION PER DAY | 219 | 8 | 1400 | 10 |  | NOT |
| TOTAL VOYAGE CONSUMPTION | 1861,5 | 68 | 11900 | 80 |  | PLANED |

## B.DEPARTURE PORT - OAKLAND

### 1.PILOTAGE INFORMATION

PILOT DISMARKING   AT LT BUOY SF 37 45,0N 122 41,5W  AND IS AVAILABLE 24HOUR

### 2. TIDAL INFORMATION

ACROSS THE BAR , THE IN-GOING STREAM  CONVERES TOWORDS THE ENTRANCE
AND IS FELT SOON ER AROUND  POINT  LOBOS  AND POINT BONITA
GOLDEN  GATE THIE IN-GOING STREAM  SETS  VERY NEARLY STRAIGHT THROUGH
WITH  A SLIGHT TENDENCY TOWARDS THE N SHORE
WITHIN  GOLDEN GATE THE MAIN PART OF THE IN-GOING STREAM  SETS NNE AND
CANSES  SWIRLS FROM GOLDEN GATE AS FAR E AS  ALCATRAZ ISLAND AND ANGEL
ISLAND
IN DETAIL INFORMATION SEE ADS NP 8  (P10.42)                  PAGE1

## 3. PROCEDURE

ON DROPPING PILOT THE VESSEL IS TO COMMENCE SEA PASSAGE BY
ALTERING COURSE TO ST'D AND FOLLOWING THE COURSES LAID DOWN.
CARE TO BE TAKEN OF TRAFFIC .

## 4. REPORTING

CALL SAN FRANCISCO PILOT WHEN PASSING REPORTING LINE
CALL SAN FRANCISCO TRAFFIC WHEN PASSING REPORTING LINE
WHEN PASSING LT.BOUY "N"
WHEN PASSING SEAWARD END
WHEN PASSING 38NM OFF Mt.TAMALPIS

## 5. WEATHER CONDITIONS

MORE LOW PRESSURE TRACKING E-NE/WARD ACROSS THE S-ERN GULF
OF ALASKA TO AVOID ING EXPOSURE TO THE HEAVIEST W'LY CONDITIONS

## C.CHARTS AND PUBLICATIONS

BA CHARTS:
558 591 229 4801 4806 4810 4813 3336 1500 1501 4512 4511 1803
1800 1340 2293 1329 2347 3666 127 1065 1259
LIST OF LIGHTS: VOL K
PLANNING CHART
4008
GENERAL CHART
4050 4053 4509
PILOT VOLS: VOL,8
LIST OF LIGHTS: VOL G
TIDE TABLES: VOL4

ALRS: 281 VOL(1) 286 VOL6(5) 286VOL6(4) .

MISCELLANEOUS: N/A

## 3. PROCEDURE

ON DROPPING PILOT  THE VESSEL IS TO COMMENCE SEA PASSAGE BY
ALTERING COURSE TO ST'D AND FOLLOWING THE COURSES LAID DOWN.
CARE TO BE TAKEN OF TRAFFIC .

## 4. REPORTING

CALL SAN FRANCISCO PILOT WHEN PASSING REPORTING LINE
CALL SAN FRANCISCO TRAFFIC WHEN PASSING REPORTING LINE
WHEN PASSING LT.BOUY "N"
WHEN PASSING SEAWARD END
WHEN PASSING 38NM OFF Mt.TAMALPIS

## 5. WEATHER CONDITIONS

MORE LOW PRESSURE TRACKING E-NE/WARD ACROSS THE  S-ERN  GULF
OF ALASKA  TO AVOID ING EXPOSURE TO THE HEAVIEST W'LY CONDITIONS

## C.CHARTS AND PUBLICATIONS

BA CHARTS:
558  591  229  4801  4806  4810  4813  3336  1500  1501 4512  4511  1803
1800  1340  2293  1329  2347  3666  127  1065  1259
LIST OF LIGHTS: VOL K
PLANNING CHART
4008
GENERAL CHART
4050  4053  4509
PILOT VOLS: VOL,8
LIST OF LIGHTS: VOL G
TIDE TABLES: VOL4

ALRS: 281 VOL(1)   286 VOL6(5)   286VOL6(4)   .

MISCELLANEOUS: N/A

# BERTH TO BERTH

| No | LATITUDE | LONGITUDE | CO (T) | DIST | DTG | CHART NO | POSITION PLOTTING INTERVAL | PRIMARY POSITION FIXING | UKC (M) | MIN CPA | REMARKS |
|----|----------|-----------|--------|------|-----|----------|---------------------------|------------------------|---------|---------|---------|
| 1 | 37 47,9N | 122 19,7W |  | 1,6 | 0 | 588 | 10MIN | RDR/VISL | 3 | 0,2' | BERTH |
| 2 | 37 48,2N | 122 21,7W | 281 | 0,5 | 1,6 | 588 | 10MIN | RDR/VISL | 1 | 0,2' |  |
| 3 | 37 48,0N | 122 22,3W | 247 | 2,9 | 2,1 | 588 | 10MIN | RDR/VISL | 0,8 | 0,2 |  |
| 4 | 37 49,9N | 122 25,0W | 312 | 0,7 | 5 | 588 | 10MIN | RDR/VISL | 1,2 | 0,2 |  |
| 5 | 37 50,0N | 122 25,9W | 278 | 1,6 | 5,7 | 588 | 10MIN | RDR/VISL | 2 | 0,2 |  |
| 6 | 37 49,4N | 122 27,8W | 248 | 0,8 | 7,3 | 588 | 10MIN | RDR/VISL | 10 | 0,2 |  |
| 7 | 37 49,3N | 122 28,6W | 263 | 4,4 | 8,1 | 588 591 | 10MIN | RDR/VISL | 42 | 0,2 |  |
|  | 37 47,3N | 122 33,8W | 243 | 3,4 | 12,5 | 588 591 | 10MIN | RDR/VISL | 1 | 0,2 |  |
| 9 | 37 46,0N | 122 37,8W | 248 | 2,2 | 15,9 | 591 | 30MIN | RDR/VISL | 1 | 0,5 | P/S |
| 10 | 3745,0N | 122 40,2W | 242 | 27,3 | 18,1 | 591 | 1HOUR | GPS | 3000 | 2 |  |
| 11 | 38 00,0N | 123 09,0W | 303 | 421,6 | 45,4 | 591 4801 | 1HOUR | GPS | 3600 | 2 |  |
| 12 | 42 41,0N | 130 00,0W | 312 | 523,9 | 467 | 4801 4810 | 1HOUR | GPS | 3000 | 2 |  |
| 13 | 47 49,6N | 140 00,0W | 306 | 444,3 | 991 | 4810 | 1HOUR | GPS | 2800 | 2 |  |
| 14 | 51 23,0N | 150 00,0W | 299 | 391,4 | 1435 | 4810 1500 | 1HOUR | GPS | 3200 | 2 |  |
| 15 | 53 42,7N | 160 00,0W | 291 | 88,4 | 1827 | 4810 3336 | 30MIN | RDR/VISL | 30 | 1 |  |
| 16 | 54 07,0N | 162 24,0W | 286 | 121,3 | 1915 | 4810 3336 4813 | 1HOUR | RDR/VISL | 200 | 2 |  |
| 17 | 54 25,0N | 165 49,0W | 278 | 146,7 | 2036 | 3336 4813 1500 | 1HOUR | RDR/VISL | 300 | 2 |  |
| 18 | 54 40,0N | 170 00,0W | 276 | 347 | 2183 | 4813 1500 1501 | 1HOUR | RDR/VISL | 600 | 2 |  |
| 19 | 54 40,0N | 180 00,0W | 270 | 358 | 2530 | 4512 | 1HOUR | GPS | 600 | 2 |  |
|  | 53 35,0N | 170 00,0E | 259 | 495 | 2888 | 4511 | 1HOUR | GPS | 390 | 2 |  |
|  | 50 00,0N | 158 00,0E | 244 | 442 | 3384 | 4511 1803 | 1HOUR | GPS | 300 | 2 |  |
| 22 | 45 00,0N | 150 00,0E | 227 | 358 | 3826 | 4511 1340 1803 | 30MIN | RDR/VISL | 50 | 1 |  |
| 23 | 41 38,0N | 143 15,0E | 236 | 107 | 4184 | 2293 1329 2347 3666 | 30MIN | RDR/VISL | 40 | 1 |  |
| 24 | 41 38,0N | 140 52,0E | 270 | 32,5 | 4291 | 1329 23473666 127 | 30MIN | RDR/VISL | 40 | 1 |  |
| 25 | 41 19,5N | 140 16,5E | 235 | 649 | 4323 | 1065 | 1HOUR | GPS | 1000 | 2 |  |
| 26 | 35 01,7N | 129 07,5E | 234 | 4,2 | 4972 | 1259 | 10MIN | RDR/VISL | 70 | 0,7 | P/S |
| 27 | 35 01,7N | 129 02,4E | 270 | 2 | 4976 | 1259 | 10MIN | RDR/VISL | 20 | 0,5 |  |
| 28 | 35 03,0N | 129 00,5E | 310 | 0,6 | 4978 | 1259 | 10MIN | RDR/VISL | 3 | 0,5 |  |
| 29 | 35 03,5N | 129 00,1E | 327 | 0,6 | 4979 | 1259 | 10MIN | RDR/VISL | 1 | 0,,2 |  |
| 30 | 35 04,0N | 128 59,8E | 334 |  | 4979,4 | 1259 | 10MIN | RDR/VISL | 2 | 0,2 | BERTH |

PAGE 3

### D. ENGINE AVAILABILITY/STANDBY

ON THIS VESSEL THE ENGINE ROOM IS ALWAYS MANNED AND BEING GOOD
ORDER, THE ENGINES ARE ALWAYS AVAILABLE FOR MANOEUVERING AT
PORT NOITICE.

### E. AREAS WHICH REQUIRE SPECIAL ATTENTION FOR CROSSING TRAFFIC/END ON TRAFFIC.

VSL ENTER INTO TSS AND RNAS SHOULD REPORT SAILING PLAN  AND POSITION
PLAN   IN DETAIL SEE ALRS VOL 6(5) P386 AND P387

# TIDAL INFORMATION

| OAKLAND | |
| --- | --- |
| 06-Nov | |
| 0229 | 0,4 |
| 0908 | 1,8 |
| 1526 | 0,2 |
| 2153 | 1,4 |
| 07-Nov | |
| 0305 | 0,5 |
| 0633 | 1,8 |
| 1602 | 0,1 |
| | |
| | |
| | |
| | |
| | |

| PUSAN | |
| --- | --- |
| 16-Nov | |
| 0232 | 2,3 |
| 0826 | 6,6 |
| 1430 | 1,4 |
| 2057 | 7,4 |
| 17-Nov | |
| 0316 | 2,4 |
| 0915 | 6,4 |
| 1518 | 1,7 |
| 2151 | 7,2 |
| 18-Nov | |
| 0413 | 2,6 |
| 1023 | 6,1 |
| 1621 | 2 |
| 2302 | 6,9 |

## 1.PILOTAGE INFORMATION
CALL PUSAN PILOT 3 HRS. IN ADVANCE OF ETA ON VHF CH13
PILOT IS COMPULSORY FOR VESSELS OVER 500GT
DETAIL SEE ALRS VOL 6(4) P283


## 2. TIDAL INFORMATION

MEAN SPRING RANGE ABOUT 1.1M; MEAN NEAP RANGE ABOUT 0.5M

## 3. WEATHER

THE WEATHER IN PUSAN IS NORMALLY FINE WITH NE PUSAN WIND. VISIBILITY
IS SEVERELY AFFECTED DURING RAIN AND FOG, SPECIAL CARE IS TO BE TAKEN
AT SUCH TIME.

## 4.REPORTING

VESSEL TO REPORT TO PUSAN PORT SERVICE WHEN PASSING REPORTING POINT
MARKED ON BA CHART 1259
## 5.PROCEDURE

VTS REPORT PROCEDUE HAVE1) ESTIMATED ARRIVED REPORT 2)INITIAL REPORT
3)ARRIVED REPORT 4) SHIFTING REPORT 5)DEPARTURE REPORT .THESE REPORT
IS COMPULSORY FOR FOREIGN VSL DETAIL SEE ALRS VOL 6(4) P283 285




## SALIENT FEATURES DURING THE VOYAGE:

1. ENSURE NAVIGATIONAL EQUIPMENT ARE TESTED BEFORE 1 HOUR DEP
 CHECK LIST SHOULD BE COMPLETED AND KEEP SHARP
LOOK OUT FOR OTHER VESSELS APPROACHING OR DEPARTING.

2.VESSEL NAVIGATED ALONG COAST, COAST CURRENT VERY
 PAY ATTENTION TO IT,KEEP VESSEL ON TRACK.

MASTER          CH. OFF          2ND OFF.          3RD OFF

PAGE 6

Fleet Management Europe Limited
*A member Of The Noble Group*  

# BRIDGE MANAGEMENT TEAM

### 1. GOOD VISIBILITY AND OPEN SEA DAY LIGHT

|          | 0000 - 0400 & 1200 - 1600 | 0400 - 0800 & 1600 - 2000 | 0800 - 1200 & 2000 - 2400 |
|----------|--------------------------|--------------------------|--------------------------|
| INCHARGE | 2/O  | C/O | 3/O |
| ASSISTING | — | — | — |
| LOOKOUT | — | — | — |
| HELSMAN | — | — | — |

### 2. GOOD VISIBILITY AND OPEN SEA NIGHT TIME

|          | 0000 - 0400 & 1200 - 1600 | 0400 - 0800 & 1600 - 2000 | 0800 - 1200 & 2000 - 2400 |
|----------|--------------------------|--------------------------|--------------------------|
| INCHARGE | 2/O | C/O | 3/O |
| ASSISTING | — | — | — |
| LOOKOUT | A/B | A/B / CADET | A/B |
| HELSMAN | — | — | — |

### 3. CONGESTED WATERS

|          | 0000 - 0400 & 1200 - 1600 | 0400 - 0800 & 1600 - 2000 | 0800 - 1200 & 2000 - 2400 |
|----------|--------------------------|--------------------------|--------------------------|
| INCHARGE | MASTER | MASTER | MASTER |
| ASSISTING | 2/O | C/O | 3/O |
| LOOKOUT | OS 1 | OS 2 | AB |
| HELSMAN | A/B | A/B | AB |

### 4. RESTICTED VISIBILITY / MAKING PORT

|          | 0000 - 0400 & 1200 - 1600 | 0400 - 0800 & 1600 - 2000 | 0800 - 1200 & 2000 - 2400 |
|----------|--------------------------|--------------------------|--------------------------|
| INCHARGE | MASTER | MASTER | MASTER |
| ASSISTING | 2/O | C/O | 3/O |
| LOOKOUT | OS 1 | OS 2 | AB |
| HELSMAN | AB | AB | AB |

Master, M.V. "COSCO BUSAN"

** Above schedule is for guidelines and can be override by Master's discretion in case of Emergency / Urgency.

*Room 1703 17th Floor, MassMutual Tower, 38 Gloucester Road, Hong Kong*
*Tel (852) 2861 3511   Fax (852) 2528 1550   Telex 79611 FLTMG*
*E-mail fmt@fleetship.com*

ENCLOSURE (27)
PAGE 8 OF 8 PAGES

*Already existed*
*Just Printed From*
*Computer*

## OAKLAND (+08)  To  PUSAN (-09)

### PILOT - PILOT / GPS ROUTE # 51 VIA UNIMAK PASS

| | Waypoint Position | Course | Track | Distance To Next Wypt | Distance Gone | Distance To Go | Projected Speed | Projected ETA |
|---|---|---|---|---|---|---|---|---|
| 00 Dep | 37-45,0 N  122-40,2 W  Oakland Plt. Stn (495) | 303,3° | RL | 27,3 | 0,0 | 4.958,1 | 24,0 kt | 07 16:00 Z |
| 01 | 38-00,0 N  123-09,0 W  Pt. Reyes (569) | 311,8° | RL | 421,6 | 27,3 | 4.930,8 | 24,0 kt | 07 17:08 Z |
| 02 | 42-41,0 N  130-00,0 W  130W (693*) | 306,1° | RL | 523,9 | 448,9 | 4.509,2 | 24,0 kt | 08 10:42 Z |
| 03 | 47-49,6 N  140-00,0 W  140W (694*) | 298,7° | RL | 444,3 | 972,8 | 3.985,3 | 24,0 kt | 09 08:32 Z |
| 04 | 51-23,0 N  150-00,0 W  150W (695*) | 290,9° | RL | 391,4 | 1.417,1 | 3.541,0 | 24,0 kt | 10 03:02 Z |
| 05 | 53-42,7 N  160-00,0 W  160W (696*) | 286,0° | RL | 88,4 | 1.808,5 | 3.149,6 | 24,0 kt | 10 19:21 Z |
| 06 | 54-07,0 N  162-24,0 W  Unimak Entrance (672*) | 278,5° | RL | 121,3 | 1.896,9 | 3.061,2 | 24,0 kt | 10 23:02 Z |
| 07 | 54-25,0 N  165-49,0 W  North Head (697*) | 275,9° | RL | 146,7 | 2.018,2 | 2.939,9 | 24,0 kt | 11 04:05 Z |
| 08 | 54-40,0 N  170-00,0 W  Unimak 170W (698*) | 270,0° | RL | 347,0 | 2.164,9 | 2.793,2 | 24,0 kt | 11 10:12 Z |
| 09 | 54-40,0 N  180-00,0 W  Unimak 180W (699*) | 259,5° | RL | 358,3 | 2.511,9 | 2.446,2 | 24,0 kt | 12 00:39 Z |
| 10 | 53-35,0 N  170-00,0 E  NW Attu Is. (700*) | 244,3° | RL | 495,3 | 2.870,2 | 2.087,9 | 24,0 kt | 12 15:35 Z |
| 11 | 50-00,0 N  158-00,0 E  Unimak 160E (701*) | 227,3° | RL | 442,2 | 3.365,5 | 1.592,6 | 24,0 kt | 13 12:13 Z |
| 12 | 45-00,0 N  150-00,0 E  Ostrov Iturop (712*) | 235,7° | RL | 358,0 | 3.807,7 | 1.150,4 | 24,0 kt | 14 06:39 Z |
| 13 | 41-38,0 N  143-15,0 E  Erimo Saki (480) | 270,0° | RL | 106,9 | 4.165,7 | 792,4 | 24,0 kt | 14 21:34 Z |
| 14 | 41-38,0 N  140-52,0 E  Benten Saki (479) | 235,5° | RL | 32,5 | 4.272,6 | 685,5 | 24,0 kt | 15 02:01 Z |
| 15 | 41-19,5 N  140-16,5 E  Tappi Shima (478) | 234,4° | RL | 648,8 | 4.305,1 | 653,0 | 24,0 kt | 15 03:22 Z |
| 16 | 35-01,7 N  129-07,5 E  Pusan TSS (598) | 270,0° | RL | 4,2 | 4.953,9 | 4,2 | 24,0 kt | 16 06:24 Z |
| 17 Arr | 35-01,7 N  129-02,4 E  Pusan Plt.Stn (599) | | | | 4.958,1 | 0,0 | | 16 06:35 Z |

**[ Summary ]**
Total Distance: 4.958,1 nm     Avg Speed: 24,0 kts
Projected: 8d 14h 35m
DEP: 7. Nov 2007, 0800 LT
ETA: 16. Nov 2007, 1535 LT

File: oak-pusk.wpw
WayPoint For Windows 3.01a

**[ Route ]**
Created by:   Zhao SHUNBIAO, 2/O
Approved by: SUN MAOCAI, Master
Modified by:

COSCO BUSAN "VRDI6"
Voy: 013W

*No Changes*
*Auto Calculated*
*Changed*
*Changed*
*Zulu times from Company or Master*
*BST deport*
*Time*
*Changes to who created by*
*Believes he*
*Puts full Months*
*of trip & voyage*